# IN THE UNTIED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

WILLIAM EAKES, III,                    )
                                       )
    Petitioner,    )
                                       )    Case No. 3:10-0367
v.                                     )    Chief Judge Haynes
                                       )
                                       )
DAVID SEXTON, WARDEN,                  )
                                       )
    Respondent.    )

## MEMORANDUM

Petitioner, William Eakes, III, filed this action under 28 U.S.C. § 2254 seeking the writ of habeas corpus to set aside his state conviction of felony murder for which Petitioner received a life sentence. After a review of the petition, the Court directed Petitioner to show cause as to why the petition should not be dismissed as untimely. Petitioner filed a response citing alleged omissions of his appointed counsel in his state post-conviction proceeding. Given the preclusive effect of a dismissal and the Petitioner's life sentence, the Court appointed the Federal Public Defender to represent Petitioner and granted leave for the Federal Public Defender to file any justification for any tolling of the federal habeas statute. The Court also granted Petitioner leave to file a supplemental petition[1] and motions to expand the evidentiary record. The Court then set an evidentiary hearing on the tolling issues.

---

[1] The Federal Rules of Civil Procedure can apply in a habeas proceeding. Mayle v. Felix, 545 U.S. 644, 649 (2005); Rule 6(a), Rules Governing Section 2254 Cases. Under Fed.R.Civ.P. 15(a), the filing of an amended complaint supersedes the prior complaint. Clark v. Tarrant County, 798 F.2d 736, 740–41 (5th Cir.1986). The second amended petition adopts and incorporates by reference the claims in the original pro se petition filed in this action, but does not present argument on all of those claims. (Docket Entry No. 37 at 14 n. 6). Those claims that are not briefed are deemed waived. United States v. Sandridge, 385 F.3d 1032, 1035 (6th Cir.2004) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). A party who has counsel cannot generally file separate papers, United States v. Jenkins, No. 03–5055, 229 Fed. Appx. 362, 370 (6th Cir. Dec.14, 2005), including in habeas actions. Keenan v. Bagley, No. 1:01CV2139, 2010 WL 1133238, at *1 (N.D.Ohio Mar.19, 2010); Adams v. Schwartz, No. CIV S–05–2237 RRB JFM P, 2008 WL 217514, at *1 (E.D.Cal. Jan.25, 2008). Thus, the Court considers only claims briefed in the amended and supplemental petitions filed by counsel.

## A. Procedural History

According to the amended petition, a jury in Davidson County found the Petitioner guilty of first and second degree murder in October 2000. On appeal, Petitioner's convictions were affirmed, but were merged into a single conviction of felony murder for which Petitioner received a life sentence. State v.Eakes, No. M2001-01420-CCA-R3-CD, 2003 WL 21523244, at *1 (Tenn. Ct. Crim. App., July 1, 2003). On December 22, 2003, Tennessee Supreme Court denied Petitioner's application for further direct review. Id. The habeas petition reflects that Petitioner filed his state post-conviction petition on December 20, 2004. Eakes v. State, No. M2005-01016-CCA-R3-PC, 2006 WL 163637 at *1 (Tenn. Ct. Crim. App. Jan. 23, 2006) and Docket Entry No. 24-1 at 1. The state trial court deemed the petition timely filed, but denied the petition for lack of factual allegations and verification by Petitioner. Eakes, 2006 WL 163637 at *1. The state trial court, however, granted leave to file an amended petition, but denied the amended petition on the same grounds. Id. at 1-2. On appeal, the Tennessee appellate court affirmed. Id. at 1. The Tennessee Supreme Court denied Petitioner's application for further direct review on May 30, 2006. Id

Petitioner's federal habeas petition was lodged with this Court on December 2, 2009 as a motion for permission to appeal. Eakes v.State, 3:09-mc-0225, Docket Entry No. 1. Petitioner was provided a standard habeas petition form that he submitted. The motion and petition were consolidated and resulted in this action that was filed on April 12, 2010. At the time of Petitioner's initial motion filed on December 2, 2009, more than three years had passed since the conclusion of Petitioner's state post-conviction appeal.

On April 24, 1996, the Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 1214 (1996), amended 28 U.S.C. § 2254 and other federal habeas corpus statutes that included a one year statute of limitation for the filing of § 2254 petitions. Under 28 U.S.C. § 2244(d), a state prisoner has one year from the date his convictions became final in which to file

his federal habeas petition. By decisional law, ninety (90) days is added after the date of the last State Court decision on direct appeal to reflect the ninety day period for a petition to the Supreme Court. Abela v. Martin, 348 F.3d 164, 172-73 (6th Cir 2003) (en banc); Pinchon v. Myers, 615 F.3d 631, 640 (6th Cir. 2010). Under the AEDPA, a proper and timely state post-conviction proceeding can toll the limitation period, 28 U.S.C. § 2244(d)(2). "The [statutory] tolling provision does not, however, 'revive' the limitations period (i.e., restart the clock at zero); it can only serve to pause a clock that has not yet fully run. Once the limitations period is expired, collateral petitions can no longer serve to avoid a statute of limitations." Vroman v. Brigano, 346 F.3d 598, 602 (6th Cir. 2003) (quoting Rashid v. Khulmann, 991 F. Supp. 254, 259 (S.D.N.Y.1998) (quotation marks omitted)).

Here, by December 20, 2004, the date of Petitioner's state post-conviction filing, two hundred seventy-two (272) days of the federal habeas limitation statute had run (from March 23, 2004, the day after Petitioner's state conviction became final after his direct appeal, until December 19, 2004, the day before the filing of Petitioner's state post conviction petition). This calculation excludes the time from December 22, 2003 to March 22, 2004 when Petitioner could have applied for the writ of certiorari to the United States Supreme Court as part of his direct appeal.[2] Bronaugh v. Ohio, 235 F.3d 280, 283–84 (6th Cir. 2000). Petitioner's state post-conviction petition was timely filed on December 20, 2004 and that proceeding tolled the federal habeas limitation period until May 30, 2006, when the Tennessee Supreme Court denied his application for permission to appeal in his post-conviction appeal. See Lawrence v. Florida, 549

---

[2]The 90 day period ended on March 21, 2004, which was a Sunday. Supreme Court Rule 30(1) provides that "[t]he last day of the period shall be included, unless it is a Saturday, Sunday, federal legal holiday . . . or day on which the Court building is closed by order of the Court or the Chief Justice, in which event the period shall extend until the end of the next day that is not a Saturday, Sunday, federal legal holiday, or day on which the Court building is closed." See also Fed. R. Civ. P. 6(a)(1)(C). Therefore, Petitioner's judgment became final on March 22, 2004. Thus, day one of the one-year statute of limitations began on March 23, 2004. See Fed. R. Civ. P. 6(a)(1)(a) (requiring that the day of the triggering event, here March 22, 2004, be excluded).

3

U.S. 327, 330-31 (2007) ("[T]he filing of a petition for certiorari before [the Supreme] Court does not toll the statute of limitations under § 2244(d)(2)."); Pinchon , 615 F.3d at 641. Petitioner filed this action on December 9, 2009, more than three years after the federal habeas limitation period expired and years beyond any act or omission of his appointed counsel in the state post-conviction proceeding.

To avoid the limitation bar, Petitioner cites his federal habeas counsel's recent review of the State's prosecutor's file. Petitioner contends that this file reveals substantial Brady and Giglio[3] material that could have been used to impeach key state witnesses on whether there was a robbery necessary for Petitioner's felony murder conviction and to justify Petitioner's life sentence. Petitioner argues that this Brady evidence is sufficient to overcome Respondent's timeliness challenge and procedural default bars, citing Banks v. Dretke, 540 U.S. 668, 695-98 (2004) (holding that where a state habeas petitioner can establish a valid Brady claim by showing that the prosecution wrongfully suppressed impeachment materials, the petitioner overcomes any procedural default). With this evidence, Petitioner also asserts that he is actually innocent of felony murder rendering his life sentence illegal. Finally, Petitioner contends that his trial and post conviction counsel were rendered ineffective due to the State's withholding of these Brady materials in the state prosecutors' files.

The Court set an evidentiary hearing on Petitioner's tolling contentions based upon his Brady and Giglio claims. To decide Petitioner's contentions requires a review of the state court record, Petitioner's Brady material, and the evidence presented at the federal evidentiary hearing on Petitioner's tolling contentions. Set forth below are the Court's findings of fact and conclusions of law.

---

[3]Brady v.Maryland, 373 U.S. 83, 87 (1963); Giglio v. United States, 405 U.S. 150, 153-55 (1972).

In sum, the Court concludes that Petitioner's claims about his state trial and post-conviction counsel were known to Petitioner during the federal habeas limitation period and are time barred. On the <u>Brady</u> and related <u>Giglio</u> claims, the undisputed facts are that Petitioner's trial counsel filed a motion for <u>Brady</u> material and the State's responded that such materials did not exist. The factual bases for these claims were first discovered by Petitioner's habeas counsel in 2013. Under Sixth Circuit precedent, the Court concludes that Petitioner exercised due diligence to discover his <u>Brady</u> claims so as to render these claims timely under 28 U.S.C. § 2244(d)(1)(D). Yet, After review of Petitioner's proof and the state record, the Court concludes that these cited documents and related materials do not satisfy the requirement of materiality under <u>Brady</u> nor false testimony required by <u>Giglio</u>. The Court also concludes that Petitioner's proof does not satisfy actual innocence standards to warrant habeas federal habeas relief.

## B. Findings of Fact

### 1. Review of the State Record

In Petitioner's direct appeal, the Tennessee Court of Criminal Appeals made extensive findings of the facts[4] underlying Petitioner's conviction:

> The following evidence was presented at the Defendant's trial: Myra Christman, the victim's mother, testified that in May 1998, she was living in Antioch, Tennessee with the victim and with the victim's step-father, Thomas Ward. She stated that the victim was approximately five feet, eight inches in height; that he weighed approximately 140 to 142 pounds; and that he was right-handed. Christman testified that on the afternoon of May 22, 1998, she went to the credit union to withdraw money from an account that she and the victim shared. She stated that she gave the victim $175 when she got home around 4:00 p.m.
>
> Christman testified that around 9:30 p.m., her sister, who was at Christman's home watching a basketball game on television, answered the telephone. According to Christman, the phone call was from "a young man" who was calling for the victim. Christman testified that the victim spoke to the person on the phone and then left home around 9:45 p.m. She stated that when the victim departed, he was wearing a

---

[4] State appellate court findings in its opinion can constitute factual findings under 28 U.S.C. § 2254(d). <u>Sumner v. Mata</u>, 449 U.S.539, 546-47 (1981).

pair of blue jean shorts, Michael Jordan tennis shoes worth about $180, and a black and gray striped shirt. She further stated that underneath his shirt, the victim was wearing a gray shirt. Christman testified that the victim was wearing a gold necklace, a gold watch that cost about $380, a gold ring with diamonds in it that cost $528, and a diamond ring in his left ear. Christman noted that the Defendant always carried his wallet with him and that his driver's license was in his wallet.

Christman testified that when the victim left home, his clothes did not have any bleach stains on them, and the victim did not have any noticeable injuries on his body. She reported that the victim left in a 1992 Nissan Sentra that was titled in her name. Christman stated that the car was white with black channels on the side. She noted that when the victim left, the rearview window on the car was not broken.

Christman recalled that when her son did not come home that night, she tried to contact him on his pager. She stated that normally when she paged her son, he returned the call immediately. Christman testified that when the victim was found, he did not have his ring, his watch, his diamond earring, his wallet with his driver's license, his shoes, or the $175 cash that was on his person when he left home.

On cross-examination, Christman testified that the victim did not pay rent to live in her house, but she stated that he gave her money to pay for the telephone bill. She stated that the victim wore designer clothes that he bought himself. Christman acknowledged that the victim had not had a job since July 1997. She testified that the victim was able to buy the clothes because he had saved money. She stated that the victim had worked since he was in the eleventh grade and that he had saved all of his money. Christman testified that the victim had been planning to go to college, so she had set up a fund for him when he was "little."

Christman testified that the victim owned a car and that he paid for his own gas. She maintained she did not know that the victim used drugs. Christman acknowledged that although she was worried about the victim, she did not call the police when he did not return home. She stated that the police came to her home on the Sunday following the victim's Friday disappearance. Christman recalled answering questions under oath on August 23, 1999, and she acknowledged that she failed to itemize any items that were taken from the victim.

On re-direct examination, Christman testified that the victim had received a settlement in 1997 resulting from a car accident in which the victim's neck and back were injured. On re-cross examination, she acknowledged that the only withdrawal made from the victim's account during April and May of that year was for $300.

Thomas Ward, the victim's stepfather, stated that he had lived with the victim and the victim's mother for twenty-two or twenty-three years. He stated that on May 22,

1998, he was at home with Myra Christman, Christman's sister, one of his friends, and the victim. Ward recalled that the victim was in his room at some point watching television. He testified that the victim left the home on Friday evening and never returned.

On cross-examination, Ward testified that he thought the victim left around 8:00 or 9:00 p.m. on that night. He recalled that the victim was wearing blue shorts and a light-colored, striped shirt when he left. Ward stated that the victim "pretty much wore jewelry all the time," but he could not specifically remember if the victim was wearing jewelry on the night that he left.

Tracy Rosser testified that in May 1998, she was working as the general manager at a Motel 6 located at 95 Wallace Road in Davidson County. She stated that the hotel had about fourteen employees and 125 rooms. Rosser recalled that on the evening of Friday, May 22, 1998, she returned from dinner around 10:30 p.m.. She testified that while she was at the front desk, she noticed a frequent guest who was requesting an additional key to her room. Rosser stated that she decided to let the guest into her room with the pass key rather than issuing an additional key. According to Rosser, as she walked the guest to room 144, she passed room 143 and noticed that the curtains were ripped down off the drapery hooks.

Rosser testified that she observed a light on in room 143, so she knocked on the door. She stated that the occupants of the room did not open the door, so she knocked again and told them that she was the manager. Rosser testified that when the occupants still did not open the door, she told them, "If you don't open the door, I'm going to call the police." She reported that a man finally "came to the door, opened it, not very much, enough to just stick his head out the door." Rosser testified that the man said his name was Jerry and told her that he knew her. She stated that she told the man that she was the manager and that she did not know him. Rosser testified that when she asked the man about the curtains, he told her, "Oh, we were just having rough sExhibit" She reported that she told the man that the hotel did not allow parties and that he replied, "Well, we just had a little fight but everything is okay now." Rosser testified that she told the man that if there were any disturbances from that room, she would have to ask them to leave, and he said, "Everything is fine."

Rosser testified that although the light was on in the room when she knocked on the door, that it was dark inside when the man opened the door. She stated that she would not have knocked on the door if the light had been turned off. Rosser recalled that the man who came to the door was wearing pants but not a shirt. She also recalled that the man "was a little sweaty." Rosser testified that she did not see anyone else in the room. She stated that at some point, the man raised his left hand to adjust the shades, but he kept his right hand behind the door. Rosser testified that she was unable to see into the room.

Rosser stated that after she left room 143, she notified the front desk that if there were any disturbances caused by any of the rooms, she was to be notified. She stated that around 2:30 a.m., she was notified that guests had tapped on the night bell to request another key. Rosser instructed the front desk to check each guest's identification and issue a key only if he or she was a registered guest. She testified that after the initial disturbance, she verified that room 143 was registered to Jerry Barnes. According to the registration slip, only one person was registered to stay in the room on that night. She testified that the $31.99 plus tax was paid for the room in cash at check-in. Rosser stated that proof of identification is required by the hotel prior to check-in.

Rosser testified that she had inspected room 143 earlier that day, and the curtains were properly hung. She stated that all of the rooms had recently been renovated and that they all had new curtains, bedspreads, and carpets. Rosser identified a photograph of the bedspread from room 143. She testified that each room was equipped with a bedspread, a set of sheets, a blanket, a mattress pad, and two pillows for each bed in the room.

Rosser recalled that around noon on Saturday, May 23, 1998, a housekeeper named George came into her office and "said that all of the bedding was missing out of one of the rooms and he saw some blood on the wall and that [Rosser] might need to come look at it." She stated that she went directly to room 143, where she observed blood on the wall, on the carpet, and on the phone. Rosser reported that the bedding was missing and that there were "a lot of empty beer bottles and a lot of cigarette butts ... laying everywhere." Rosser stated that she locked the door and called the police. She testified that Jerry Barnes did not return the key to room 143.

On cross-examination, Rosser identified the man who answered the door of room 143 on the evening of May 22, 1998 as Jerry Barnes. She stated that she did not receive any complaints regarding room 143. Rosser recalled that three or four hooks on the drapes in room 143 were "off." She stated that she knocked on the door to room 143 because she thought there might have been a party inside.

**Detective Johnny Lawrence testified that he had been employed by the Nashville Metropolitan Police Department since November 1981** and that in May 1998, he was working in the Homicide Unit. He recalled that on May 23, 1998, he was dispatched to room 143 of the Motel 6 near I-24 and Harding Place. He reported that when he arrived on the scene at approximately 1:50 p.m., Officer Campbell had already secured the room and obtained some information from employees. Lawrence observed blood splattered on the wall, on the telephone, and on the table. He stated that there was a large amount of blood on the floor that had soaked into the carpet. He also stated that there were no linens on the beds. Lawrence testified that the only area that really seemed to be disturbed was the area between the bed and the window.

He noted that it was "weird" that there were "all these cigarette butts on top of the carpet and none of them [had] blood on them, which would indicate that the cigarettes came after the blood." He explained, "Otherwise, the blood would be on top of the cigarettes."

Lawrence testified that by the time he arrived at the scene, Officer Campbell had obtained the name and address of a suspect, as well as the license plate number of the suspect's truck. According to Lawrence, the suspect's name was Jerry Barnes, and he resided at 212 Old Tusculum Road. He stated that the license plate of the truck was registered to a company. Lawrence testified that when he arrived at Barnes's home, he saw a green truck with a Tennessee Titans decal on the door. He reported that the license plate number on the truck matched that listed on the registration from the Motel 6. Upon closer examination, Lawrence observed dried blood on the outside of the driver's door, on the seat, and on the emergency flasher button. He stated that he secured the vehicle and then went to the door of the home.

Lawrence stated that a woman who identified herself as Jerry Barnes's wife came to the door. He stated that Barnes's wife told him that Barnes had just gone to the store to buy some beer. Lawrence testified that he had received information at the hotel about the Defendant, and he asked Barnes's wife if she had seen him. He stated that Barnes's wife told him that the Defendant was with Barnes. Lawrence testified that Barnes's wife led him to a washing machine and pulled some laundry out of the machine that had been freshly washed and that was still damp. According to Lawrence, the clothing included a pair of sweat pants and a black tee shirt with a ball team logo on the front of it. He stated that the clothes were heavily stained with what appeared to be blood.

Lawrence testified that the truck was photographed at the scene and that it was then taken to the crime laboratory to be processed. He stated that the truck belonged to Tennessee Valley Exterminating. Lawrence believed that Officer Shea processed the vehicle on May 29, 1998. Lawrence testified that he returned to the hotel and then went back to the Barnes residence around 5:00 p.m., but nobody answered the door. He stated that he later went to the Defendant's home at 3429 Keeley Drive. Lawrence testified that prior to going to the Defendant's home, he had placed a BOLO ("be on the look out") for Jerry Barnes and the Defendant, along with a description of a blue Corsica owned by Barnes.

Lawrence reported that he had received information that Barnes often rented hotel rooms in the area, so he had officers check every hotel near the Motel 6. He stated that on May 24, 1998, an officer located Barnes's vehicle at a Super 8 Motel on Harding Place. Lawrence testified that the front desk confirmed that the Defendant had rented room 349 of that hotel. He recalled that just as officers were about to approach the room, Barnes and the Defendant walked outside. Lawrence stated that

Barnes "started talking to [him] just the minute he saw [him]," but the Defendant did not say anything. According to Lawrence, Barnes told him that he could take the officers to the victim. He testified that Barnes led police to a salvage yard off of Almaville Road in Rutherford County.

Lawrence testified that Barnes led police to a Nissan Sentra that was located "quite some distance off the road," and he stated that there was "no way the car could have been found if [Barnes] hadn't shown [police] where it was at." Lawrence testified that the vehicle was "way off in the woods, down a little embankment, wedged between two trees." Lawrence observed "a lot of blood coming out of the wheel well on the left side." He stated that blood appeared to be coming from the trunk area. Lawrence testified that a deceased victim was found inside the trunk.

On cross-examination, Lawrence acknowledged that some of the furniture in the Motel 6 room had been moved to process the crime scene. He stated that he was not aware that any of the blood had been tested. **Lawrence testified that a piece of some form of jewelry, specifically a "chain of some type," was found at the end of the bed. Lawrence opined that it could be part of a bracelet or a necklace.** He stated that when he first saw Barnes at the Super 8 Motel, Barnes was very apologetic. Lawrence reported that a piece of steel wool that could have been used as drug paraphernalia was found. He recalled that the license plate was missing from the victim's Nissan Sentra when it was located by police. Lawrence observed a contusion on Barnes's left thumb. He could not specifically remember the victim's family mentioning any jewelry that belonged to the victim.

On redirect examination, Lawrence testified that the Defendant was not taken to the hospital for any injuries. On re-cross examination, he stated that evidence was obtained from at least five different locations in south Nashville.

Edward Michael Shea testified that he is a crime scene investigator with the Metropolitan Police Department. He stated that he examined a 1996 Isuzu two-door truck in connection with this case. Shea observed a blood stain in the front seat of the truck near the gear shift and a small amount of blood around the door panel area. He stated that both samples tested positive as being blood. On cross-examination, Shea reported that he did not lift any fingerprints from the vehicle. He stated that he did not do any tests to determine whose blood was in the truck.

Steve Stone of the Metropolitan Police Department Crime Scene Unit testified that he went to Jerry Barnes's home, where he was given some items of clothing from Detective Lawrence. He also testified that he photographed blood stains on the door of Barnes's truck. **Stone reported that he examined room 143 at the Motel 6 and collected the following items: a blood-stained white mattress pad, a sample of the carpet that appeared to have a blood stain on it, a couple of pieces of jewelry**

10

**that appeared to be parts of a necklace or a bracelet, a sample of the mattress that appeared to have a blood stain on it,** the coiled cord from the telephone in the room which appeared to be stained with blood, and numerous Marlboro Light cigarette butts. Stone testified that in addition to the items he collected, he also dusted several items in the room for fingerprints, including a light switch plate, the area around the television, the television remote control, the telephone, and beer cans and bottles that were in the trash and on the floor.

On cross-examination, Stone stated that he went to Barnes's home before going to the Motel 6. He testified that he was the only officer in charge of processing the hotel room. Stone noted that it was apparent that there had been a struggle in the room. He maintained that he did not see a piece of jewelry in the room.

Wayne Hughes testified that he is an officer with the Identification Division of the Metropolitan Police Department. He stated that on Sunday, May 24, 1998, he responded to a call at the Super 8 Motel at 350 Harding Place. Hughes reported that he met with Officer Mark Nelson and photographed a blue Corsica located at the motel. He testified that he then met Detective Johnny Lawrence on Hill Road in Rutherford County, where the police found the victim's white Nissan Sentra parked in a field "quite a distance off the road." He stated that he photographed the vehicle and collected a Budweiser beer bottle that was nearby. Hughes testified that he gave the bottle to Officer Blackwood for testing.

Officer Robert Collins testified that he is a member of the K-9 Section of the Metropolitan Police Department. He stated that on or about May 24, 1998, he was requested to do an "article search" at the Hillcrest United Methodist Church at 5112 Raywood Lane in South Nashville. He reported that with the assistance of a canine, he looked for, and found, an ax. On cross-examination, Collins testified that the ax was located in a wooded area amongst some weeds.

Tim Matthews testified that he works in the Identification Section of the Metropolitan Police Department as a crime scene investigator. He stated that on May 24, 1998, he was dispatched to Fairlane Square on Nolensville Road to recover some evidence found in a dumpster behind a shopping center. Matthews reported that the evidence included several cloth items that appeared to have blood on them. He testified that he recovered a white plastic bag which contained a gray teeshirt with a UT 1997 "SEC Champions" logo on it, one white pillowcase, one white bed sheet, one pair of Britannica blue jeans, one pair of H.I.S. blue jeans, and one white washcloth. He stated that in a pocket of the H.I.S. jeans, he found three paper hand towels, one "six-pack holder like a can holder and plastic," and one faucet screen that would screw into a faucet.

11

Matthews testified that he also investigated another dumpster located on a street near the first dumpster. He stated that he recovered two white plastic garbage bags from it which contained the following items: one pillow that was white with blue stripes, one blue blanket, and one multi-colored bedspread that was soaked in blood. Finally, Matthews testified that he went to an area behind Hillcrest Methodist Church, located at 5112 Raywood Lane. He stated that he photographed the area and an ax that had been located by the canine unit. Matthews reported that the ax had "Scout Felling Ax" written on it. He then sent the ax to be tested.

On cross-examination, Matthews recalled that Detective Tim Mason was present when he arrived at the first dumpster. He acknowledged that he could not identify who had worn the jeans that he found in the second dumpster. Matthews testified that all of the items of clothing appeared to have blood on them. He stated that it was possible for the blood on one item of clothing to be transferred to another.

**Charles Blackwood, Jr., testified that he is a member of the Forensics and Firearms Unit within the Identification Unit of the Metropolitan Police Department.** He stated that he examined a "Scout Felling Ax" in connection with this case. Blackwood reported that he was unable to lift any prints off of the ax, but he did determine that there was blood on the ax. Blackwood also examined a comforter that appeared to have blood on it.

Blackwood testified that he processed the Nissan Sentra in which the victim was found. He stated that some sort of liquid had been poured on the vehicle which had run off and had been wiped off. Blackwood testified that he lifted several latent fingerprints from the Sentra. He stated that he turned the fingerprints over to Loretta Marsh for testing.

Blackwood testified that when the Sentra was brought into the lab for testing, the trunk was locked, and he was told that there was probably a body inside. He stated that he carefully processed the vehicle. Blackwood determined that there were no usable fingerprints on the outside trunk area of the car. He opened the trunk, took photographs of the body, and processed the inside of the trunk for fingerprints. Blackwood testified that part of the rearview mirror, along with an air freshener that usually hangs from rearview mirrors, were on the driver's side floorboard.

According to Blackwood, the clothes that the victim was wearing appeared to have been bleached in spots. He noted that there was a pattern of spots on the victim's clothing. He stated that most of the bleaching was on the front of the victim's clothing. Blackwood testified that one of the victim's pants pockets was turned inside out. He stated that the victim was not wearing a watch or any type of jewelry. **Blackwood reported that the victim was not wearing shoes or socks, and his feet**

**appeared to be clean. He stated that the victim had an injury to his right index finger.**

On cross-examination, Blackwood acknowledged that he processed the ax in this case. He stated that the ax had a sharp side and a blunt side. Blackwood observed what appeared to be blood on the outside front area of the Sentra. He determined that some substance had been poured over the back of the trunk of the vehicle which could be consistent with someone trying to wipe the car down. Blackwood testified that he did not see a watch, jewelry, a beeper, shoes, or car keys on the victim or in the trunk. He stated that he did not see any tags on the back of the car. He noted that it was possible that socks were in the car.

Lorita Marsh testified that she works in the Identification Unit of the Metropolitan Police Department as a Police Identification Analyst. She stated that she determines the classification and identification of latent fingerprints. Marsh testified that when fingerprints are lifted from a crime scene or an imprint card, she identifies the print with a person. She reported that in May 1998, she examined a number of fingerprints recovered in this case. Marsh testified that a fingerprint which was lifted from the outer front door glass of the Sentra belonged to Jerry Wayne Barnes. She stated that she matched another print to Barnes that was lifted from the outside driver's door window. Marsh then analyzed a fingerprint taken from a beer can that was found in room 143 of the Motel 6. She stated that the fingerprint also belonged to Barnes. On cross-examination, Marsh testified that according to the fingerprint cards, Officers Blackwood and Stone lifted the prints that she analyzed.

Detective Tim Mason of the Metropolitan Police Department testified that he is a member of the murder squad which is part of the Homicide Division in the Criminal Investigation Division. He stated that he became involved in the present case on Sunday, May 24, 1998. Mason testified that he received a call for assistance at the Super 8 Motel on Harding Place. He recalled that when he arrived, Detective Johnny Lawrence and several patrol officers were already present. Mason testified that he was part of a team that arrested the two suspects in this case.

Mason stated that when he arrived, Detective Lawrence asked him to secure Room 349. He reported that he and several patrol officers located room 349 upstairs, but just as they were about to enter the room, "the door came open and the people [they] were looking for just walked out into the hall." Mason testified that he spoke with both the Defendant and Jerry Barnes at the scene. He recalled that he first spoke to the Defendant, who denied any knowledge of the crimes in this case. However, he stated that Barnes immediately told him that he knew why the police were there and that he would take them to find the body of the victim. Mason testified that Barnes led police to a wooded area off of Almaville Road in Rutherford County. He stated that at that location, police found a vehicle which appeared to have blood coming out

of the trunk area. According to Mason, the Defendant was five feet, eleven inches tall and weighed about 195 pounds, and Barnes was five feet, eleven inches tall and weighed about 220 pounds. He recalled that Barnes had an injury to his thumb that appeared to be a human bite mark.

**Mason testified that the Defendant waived his Miranda rights and gave a statement. He reported that the Defendant did not appear to be under the influence of any intoxicants at the time of his statement. Mason testified that the Defendant had completed the tenth grade in school. He stated that he videotaped the Defendant's statement, and the statement was introduced into evidence.**

**On cross-examination, Mason testified that the Defendant acknowledged being in room 143 of the Motel 6. He stated that the Defendant said the victim was bringing him and Barnes some "rock cocaine." According to Mason, the Defendant stated that Barnes and the victim got into a fight, and the Defendant became involved in the fight only when Barnes asked for help. Mason reported that the Defendant told him that he initially hit the victim with a telephone, then went outside to the truck, got an ax, and hit the victim with the blunt side of the ax.**

**Mason acknowledged that the Defendant told him about the dumpsters where the clothes could be found. He also acknowledged that the Defendant told him where the ax was located. According to Mason, the Defendant stated that the manager of the Motel 6 came to the door after the fight and that Barnes became worried. He stated that the Defendant told him that after the incident, he and Barnes went to Wal-Mart to get Barnes a shirt and a pair of pants. Mason testified that Barnes is the Defendant's uncle. He stated that although the Defendant denied it at first, he later admitted to helping choke the victim by putting his hands over Barnes's hands and pressing down. According to Mason, the Defendant stated that he threw the tag to the victim's car out of the car window. He could not recall asking the Defendant about any missing jewelry or a wallet.**

The Defendant's videotaped statement was played for the jury. In the statement, the Defendant told Detective Mason that Jerry Barnes was supposed to receive crack cocaine from the victim. He stated that the victim attempted to rob Barnes, and a fight ensued. According to the Defendant, the victim began biting Barnes's thumb, and Barnes then asked the Defendant to help him. The Defendant testified that he hit the victim with a telephone and then went out to Barnes's truck to get an ax. He stated that he hit the victim in the back of the head with the blunt end of the ax. The Defendant testified that Barnes began to

**choke the victim and that he placed his hands over Barnes's hands to help him choke the victim. He recalled the hotel manager coming to the door and stated that Barnes was not wearing a shirt at the time. The Defendant told Mason that he later went to Wal-Mart to purchase a pair of sweat pants and a shirt.**

**According to the Defendant, after the crime, he drove Barnes's truck and Barnes drove the victim's car. He reported that he followed Barnes to Rutherford County and then drove Barnes back home. The Defendant stated that he threw the victim's license plate out of the window, but he did not remember the location. He told Mason the location of the ax, clothing, and bedding.**

The taped deposition of Dr. William Hughes was played for the court wherein Dr Hughes testified regarding injuries to Jerry Barnes' thumb. Hughes was unable to testify at trial due to commitments at Metropolitan General Hospital and the medical school. Barnes's medical records were also introduced into evidence.

Dr. Hughes testified that on Sunday, May 24, 1998, he was working in the emergency room at Meharry Hospital. He reported that Jerry Barnes was brought to the hospital by police. Dr. Hughes testified that according to the medical records, Barnes's chief complaint was that he had been bitten on the left thumb on the prior Friday. He testified that the diagnosis of Barnes's injury was consistent with Barnes's story that he had been bitten by a person two days prior. Dr. Hughes noted that Barnes's thumb was swollen and bruised under the nail. He also noted that Barnes had teeth marks on his thumb and a decreased range of motion. Dr. Hughes testified that Barnes's wound had become infected, which he stated would have caused a great deal of pain. He acknowledged that it was possible that the nail prevented the teeth from biting all the way through the thumb.

Dr. Hughes acknowledged that he did not specifically remember Barnes or his injuries. He stated that he testified according to what he had written in the medical chart. He explained that he took notes for diagnosis and for documentation. Dr. Hughes testified that Barnes did not have any fractures or broken bones and that all of his nerves and blood vessels were intact. He did not record any other complaints by Barnes. Dr. Hughes testified that the injury would not have caused a profuse amount of bleeding.

Dr. Bruce Philip Levy, Chief Medical Examiner for the State of Tennessee and County Medical Examiner for Nashville, Davidson County, testified that he is qualified in the courts of Tennessee as an expert in the field of forensic pathology. He stated that he performed an autopsy on the victim in this case on May 25, 1998. Dr. Levy testified that the victim was a twenty-one-year-old black male. Dr. Levy noted that the victim was five feet, nine inches tall and weighed 142 pounds at the

time of death. He stated that the victim was pronounced dead on May 24, 1998 at 1:30 p.m.

Dr. Levy determined that the victim was manually strangulated and explained that he came to that conclusion based on hemorrhages in the muscles inside of the victim's neck on both sides at multiple different levels and based on the presence of petechial hemorrhages, which he explained are extremely fine pinpoint hemorrhages into the conjunctiva of the eye. Dr. Levy also made a second diagnosis of "blunt impact injuries of the head." He stated that there were various injuries about the victim's head, including lacerations, abrasions, and contusions. Dr. Levy testified that he also diagnosed blunt impact injuries to the victim's torso and extremities. He stated that the victim had sustained bruises, scrapes, and lacerations.

Dr. Levy testified that by the time he examined the body, he noted putrefacted decomposition. He explained that this indicated that the victim had been deceased for a period of time long enough for the body to begin to undergo some post-mortem changes. He stated that the victim also had pulmonary vascular congestion, which is the "backing up of blood into the lungs." He explained that pulmonary vascular congestion is very common. Finally, Dr. Levy testified that the victim had aortic atherosclerosis, which is a small amount of fatty deposits in the major arteries of the body. He used autopsy photographs to assist in his description of the victim's injuries to the jury. The photographs were admitted into evidence.

Dr. Levy testified that the victim was fully clothed when he was brought in for the autopsy. He stated that the victim was wearing a gray shirt, a pair of blue denim shorts, and two pairs of green undershorts. Dr. Levy noted that there were no holes or defects in the clothing.

Dr. Levy stated that on the victim's right hand was "a three-quarter inch long laceration or a tearing of the skin" and that there was a hemorrhage, abrasion, or a scrape on the back of his left thumb. He testified that the laceration on the victim's right hand appeared to be a defensive wound. He opined that the victim attempted to defend himself while he was being attacked. Dr. Levy testified that the victim had abrasions on the fronts of both of his knees and that there were two lacerations on the back of his head. Dr. Levy testified that there were no external injuries to the victim's neck, which he stated was not unusual in strangulation if the pressure on the neck was applied until death.

Dr. Levy testified that there were a series of superficial injuries on the inside of the victim's lower lip. Dr. Levy reported that such injuries are typically caused by the lips being pressed against the teeth beneath them in the mouth. He stated that such injuries may be caused by the person being struck in the mouth or falling on an object or on the floor. Dr. Levy maintained that the injuries were not caused by a thumbnail

or a fingernail. Dr. Levy noted that the victim had a laceration on his forehead and bruising around the left eye and left cheek area.

Dr. Levy reported that marijuana and cocaine metabolites were found in the victim's urine. He also stated that there was a small amount of alcohol in his blood and in the fluid in his eyes. Dr. Levy further noted the presence of cocaine in the victim's blood. He testified that the existence of cocaine metabolites and cocaine indicated that the victim had previously used cocaine and was also under the influence of cocaine at the time of his death.

Dr. Levy testified that the cause of death to the victim in this case was manual strangulation. He stated that strangulation causes a lack of oxygen to the brain, which causes irreversible brain damage and death. He testified that the methods of strangulation are obstruction of the veins transporting blood from the head to the body, obstruction of the arteries blocking the flow of blood from the body to the head, and the actual obstruction of the airway itself. Dr. Levy explained that obstruction of the actual airway is extremely rare because it takes a relatively great amount of pressure to collapse an airway. He stated that in this case, it appeared as though the primary mechanism of strangulation was occlusion of the arteries themselves. Dr. Levy testified that in a case involving an occlusion of the arteries, a victim would lose consciousness before the time of death. He stated that studies have indicated that it takes about four minutes of blocking blood flow to the brain to cause irreversible brain damage and death. However, he stated that a person would begin to lose consciousness after thirty to sixty seconds.

On cross-examination, Dr. Levy testified that he observed signs of a struggle on the victim's body. He stated that the two lacerations on the back of the victim's head were consistent with someone striking the victim twice in the back of the head with a blunt object. Dr. Levy noted that the victim was probably hit three times on the face: once on the forehead, once around the left eye, and once around the left cheek. He testified that the victim's skull was not fractured and that the victim's brain was not injured. Dr. Levy acknowledged that most any solid tangible object could have caused the lacerations on the victim's head. He noted that the victim was likely strangled after the blows to the face because the body had a chance to react, and the swelling had an opportunity to occur. Dr. Levy testified that there were no injuries to the right side of the victim's face.

Dr. Levy acknowledged that the victim's blood was not tested for marijuana. He stated that cocaine enhances behavioral effects upon the body and that it excites the central nervous system, increases blood pressure, and increases heart rate. He acknowledged that the effects of cocaine could cause more blood loss. Dr. Levy testified that there would have been a surge of adrenaline in the victim if he had been in a fight. He reported that the surge of adrenalin, cocaine, and being out of breath

from a fight could have decreased the amount of time for irreversible brain damage and death. Dr. Levy noted that there was a possibility that the victim had a seizure while being strangled.

Lisa Barnes, the Defendant's aunt and Jerry Barnes's wife, testified that her brother is the Defendant's father. She stated that the Defendant was twenty years old at the time of trial. Lisa Barnes testified that she had been married to her husband for thirteen and a half years and that she had known him for sixteen years. She acknowledged that the Defendant had known Jerry Barnes for the majority of his life. Lisa Barnes stated that her husband was in jail at the time of trial.

Lisa Barnes testified that at the time of the offense in this case, she was working for CNA Insurance Company, and her husband was working for Tennessee Valley Exterminating. She stated that her husband drove a company truck and had a company credit card. Lisa Barnes testified that she managed the budget in their family. She stated that her husband would generally cash his paycheck and give her the money. She testified that her paycheck was directly deposited into her account. Lisa Barnes reported that she and her husband had $5000 in one of their savings accounts and $16,000 or $17,000 in the other savings account. She stated the second account was from her father's life insurance. She testified that at the time of the offenses in this case, she and her husband had around $1400 in their checking account.

Lisa Barnes testified that she and her husband lived at 212 Old Tusculum Road. She acknowledged that her husband had a drug problem which caused problems in their marriage. She testified that when her husband was under the influence of drugs, he "would sweat profusely, be very paranoid, shift around a lot, [and] couldn't sit still." She stated that on the evening of May 22, 1998, her husband came home around 2:00 or 2:30 a.m. Lisa Barnes testified that her husband was in "a little white car" which he parked on the street in front of their driveway.

Lisa Barnes testified that after her husband arrived home, she followed him to the Apollo Apartments to drop off a car. She recalled that the following morning, she and her husband went to the store to get laundry detergent, and he put water in her car radiator. She stated that she and her husband stopped by the Defendant's apartment that morning, picked up the Defendant, and then went back to her house, where she and her ten-year-old son were dropped off. She testified that she did not see her husband again until Sunday morning. She stated that she rode with her husband and the Defendant to the bank, where she withdrew $300 and gave it to her husband. According to Lisa Barnes, her husband needed money and did not have his bank card.

Lisa Barnes testified that after her husband left on Saturday, Detective Johnny Lawrence came to her house. She stated that after Lawrence asked her what her

husband was wearing the previous day, she gave Lawrence certain items of clothing out of her washing machine, including a pair of sweat pants and a shirt. Lisa Barnes acknowledged that she told her husband that the police were looking for him. She stated that she had spent the night with a friend, and her husband came to her friend's house.

On cross-examination, Lisa Barnes stated that her name was listed on her checking and savings accounts, but her husband's name is not listed. She testified that she was the only person who wrote checks from the checking account and that she had the only bank card for that account. She stated that she and her husband had filed for bankruptcy about four months prior to her father's death. Lisa Barnes testified that she would not let her husband come home if he was under the influence of drugs and that she would not give her husband money if she thought he was going to use it to buy drugs. She reported that her husband had pawned some of their personal items in the past so that he could buy drugs.

Lisa Barnes testified that when her husband came home on the weekend of the murder, he had been on a "cocaine binge" for three or four days. She stated that she knew her husband had been home while she was not there because he had changed his clothes. She stated that she saw her husband Friday afternoon around lunchtime and did not see him again until 2:00 or 2:30 a.m. the next morning. Lisa Barnes testified that her husband was "drugged out" when he came home early Saturday morning and that he was in a different car which she had seen before. She stated that she did not see any blood on the car. She recalled that she got dressed and followed her husband in her blue Corsica to the Apollo Apartments. Lisa Barnes reported that she watched her husband park the white Nissan and leave it at the apartments. She stated that she drove her husband home and then he took her car and left.

Lisa Barnes testified that after they dropped off the car, she and her husband went home. She stated that he came in for a few minutes, but he was "paranoid and he was looking out the windows and he was sweating profusely because he was strung out on crack cocaine." She testified that when she woke up, her husband was still home. Lisa Barnes stated, "I heard the door open and I looked out the window and [the Defendant] was driving down the street in his car and Jerry left and got in the car with [the Defendant.]" She testified that her husband got in the car with the Defendant around 3:15 a.m. She recalled that the Defendant was driving an Impala that belonged to her brother. Lisa Barnes testified that about ten or fifteen minutes after her husband left with the Defendant, her husband returned in his green company truck.

Lisa Barnes reported that after her husband returned in the green truck, he came inside and "was walking around the house, looking out the windows." She testified that the following morning around 8:00 a.m., her husband drove her and her

19

nine-year-old son in the blue Corsica to get laundry detergent. Lisa Barnes acknowledged that she had bleach in her home and that she also had chlorine because they had a pool. She stated that on their way home, her husband picked up the Defendant. She testified that her husband and the Defendant dropped her and her son off at home and then left at approximately 9:00 or 9:30 a.m.

Lisa Barnes testified that she did not hear from her husband again before the police arrived at her home on Sunday morning. She acknowledged that she did not tell the police about the events of the previous night. She testified that her friend later called the police. Lisa Barnes testified that her husband did not change clothes when he came home around 2:00 or 2:30 a.m., but he did change clothes before they went to the store to get laundry detergent.

On re-direct examination, Lisa Barnes testified that she would not give her husband money if he was under the influence of drugs. She acknowledged that even when her husband was under the influence of drugs, he would still go to work. She reported that she had seen the white Nissan at her house "on multiple occasions." Lisa Barnes testified that she and her husband had gotten into arguments in the past over the white car being at her house. She stated that earlier on Friday, she picked up her husband and the Defendant at the corner of Nolensville Road and Brewer. She recalled that her husband was under the influence of alcohol and the Defendant did not have his driver's license with him, so the police would not let them drive the car. Lisa Barnes testified that the location where she picked up her husband and the Defendant was about a block from Hillcrest United Methodist Church.

Dr. Charles Warren Harlan testified that he is a physician specializing in the areas of anatomic, clinical, and forensic pathology. He stated that with the exception of certain counties, he performs autopsies for the counties in Middle Tennessee, and he also performs autopsies on a private basis as contracted. Dr. Harlan testified that he reviewed the autopsy report and the autopsy photographs of the victim in this case. Dr. Harlan noted from the autopsy report that the victim was under the influence of cocaine at the time of his death. He stated that he was aware that the medical examiner's opinion was that the victim died of manual strangulation.

Regarding the physiological effects of cocaine on the human body, Dr. Harlan testified that cocaine acts initially as a central nervous system stimulant and eventually becomes a central nervous system depressant. He explained that cocaine acts on the chemicals which transmit the impulses from one nerve fiber to another nerve fiber and from a nerve fiber to a muscle fiber. He further explained that cocaine may be a cardiac irritant or it may actually physically damage the heart muscle fibers themselves. Dr. Harlan testified that the immediate effect of cocaine on the heart is a stimulus effect which causes it to pump harder. Dr. Harlan testified that adrenalin also has a stimulant effect on the body. He explained that adrenalin causes the heart

to beat more rapidly and more strongly. He stated that any physical, mental, or emotional stress can cause the release of adrenaline into the body.

Dr. Harlan testified that oxygen deprivation varies and that oxygen deprivation can occur in everything from the individual cell up to the complete person. According to Dr. Harlan, cocaine, adrenalin, and oxygen deprivation are all factors in considering the amount of time that it takes an individual to succumb to strangulation. He testified that the lack of petechia in the eyes reflects upon the amount of time associated with the actual act of manual strangulation. Dr. Harlan testified that it takes a person somewhere between thirty seconds and a few minutes to die from manual strangulation. He stated that the amount of time required for strangulation would be affected if the individual was under the influence of cocaine, was under an adrenalin rush, and was experiencing physical exertion at the time strangulation began. Dr. Harlan opined that in this case, the length of time of strangulation was closer to thirty seconds and could possibly have been less.

Dr. Harlan testified that it is very possible that as a result of the strangulation, the victim had a cardiac arrhythmia or a heart fibrillation which ultimately caused the victim's death. He stated that blood loss or the use of cocaine could cause heart fibrillation. Dr. Harlan reported that the injuries to the victim were consistent with a struggle.

On cross-examination, Dr. Harlan acknowledged that he was not present when the autopsy was performed on the victim. He stated that he reviewed two photographs that were attached to a prior deposition given by Dr. Levy. He noted that he reviewed more photographs on the morning of the trial. Dr. Harlan admitted that his conclusions were based on the deposition of Dr. Levy in a civil matter, the written autopsy report, and two photographs. He also acknowledged that in none of the photographs was he able to see the whites of the victim's eyes or the linings around the victim's eyes. Dr. Harlan testified that he was not contesting that the victim died of manual strangulation. He acknowledged that the prosecution came to his office and that he refused to answer questions regarding his opinion in this case. On re-direct examination, he acknowledged that he was formerly the medical examiner for Davidson County, but that he reached a separation contract with the government due to "irreconcilable differences."

Eakes, 2003 WL 21523244 at * 1-15 (emphasis added).

## 2. The Federal Habeas Record

In this action, Petitioner submitted his affidavit on the issues of his guilt and the ineffectiveness of his trial, appellate and post-conviction counsel:

1. Rayburn McGowan was my defense lawyer in my underlying state case where I was prosecuted on murder charges. McGowan did not adequately try to get a plea bargain in my case.

2. I was tried for first-degree felony murder on the theory that my uncle and I killed Tahitian in the course of robbing him. That was not true. I was not part of any robbery or theft and did not even witness a robbery or theft. Even at the time I was arrested, I was ignorant that any property may have been taken from Tahitian's body. I wish I would have testified to the jury about this matter so I could have made it clear that I was not part of any robbery or theft (or any attempted robbery or theft). My defense counsel, McGowan, told me I should not testify, however, and I deferred to his apparent expertise. I believe that was a mistake, and that I should have testified.

3. I also believe it was a mistake to trust McGowan to adequately investigate the case. In my view, he should have proven that Tahitian was my uncle's regular drug source; he should have proven that Tahitian's parents were lying about their knowledge of Tahitian's drug activities and were lying about his movements and possessions on the night in question; and he should have proven that it was evident that my uncle, rather than I, had the best opportunity after Tahitian's death to take items from his clothing and body (because my uncle, not I, took Tahitian's body away from the scene). There are probably other things he should have proven but since I'm incarcerated I cannot investigate those matters myself.

4. I wound up convicted of first-degree felony murder and got a sentence of life. Jay Martin handled my appeal, which did not succeed. When it came time for me to file my post-conviction petition, I filled out the form in prison and had my verification signature notarized. I have attached that form, as I filled it out in December 2004, hereto as Exhibit A. Instead of filing that verified form, Martin chose to file a petition - which was not signed by me - that he typed. Martin did not represent me. He just filed the petition.

5. Judge Seth Norman rejected that petition because it didn't allege facts and lacked my verification signature. Martin then filed a second petition without my permission. That petition likewise was not verified by my signature, and it added very little in the way of factual allegations. Judge Norman then summarily dismissed that second petition. Consequently, I never got the chance to litigate a state post-conviction petition.

6. I was ignorant of any federal habeas corpus remedy. I subsequently filed additional petitions with in the state courts in my effort to get post-conviction review, but they were all denied. Finally, shortly before I filed my *pro se* federal habeas petition, I met a man in prison who informed me about the federal habeas remedy. That is why I filed for relief in federal court.

7. I have just been shown, today, the motion for a new trial that Mr. McGowan filed in my case. It mentions an interview with Corey Watkins that contained favorable information for my defense. I was unaware of that evidence until today.

(Docket Entry No. 24-7, Petitioner's Affidavit at 1-3).

According to the court filings, Jay Martin, Petitioner's appellate counsel in the direct appeal, sent a letter to Petitioner informing Petitioner that he could file a state post-conviction petition in the court of Judge Seth Norman within one year, i.e., by December 21, 2004. (Docket Entry No 24-8, Martin Letter.) Martin's letter did not mention any federal habeas remedy. Id. On December 16, 2004, Petitioner notarized his pro se state post-conviction petition, (Docket Entry No 24-9), and mailed this petition to Martin who submitted a typewritten version of the pro se petition. (Docket Entry No 24-1). In a word, the verified pro se state post-conviction petition was not filed, and the type-written version was not verified.

The state post-conviction court found that petition legally insufficient for lack of factual allegations and verification by Petitioner, but granted leave to file an amended petition. (Docket Entry No 24-2). Martin then filed an amended petition without consulting Petitioner, and the state trial court dismissed that petition for the same reasons as the earlier petition. (Docket Entry Nos. 24-7 at 2, 24-3 and 24-4). On the post-conviction appeal, the Tennessee appellate court affirmed the order of dismissal. Eakes, 2006 WL 163637 at *1. Petitioner filed another state post-conviction petition that was denied on November 2, 2009. ( Docker Entry No. 8, Petition at 4). Petitioner asserts that he did not file any federal habeas petition because he was unaware of any federal law remedy until a man at the prison informed him. (Docket Entry No. 24-7, Eakes Affidavit at 2).

a. The **Brady** Documents and Related **Giglio** Materials

For his <u>Brady</u> claims, Petitioner cites documents from the state prosecutor's files that Petitioner contends contain exculpatory evidence and that the State failed to produce prior to Petitioner's trial. The following documents and related <u>Giglio</u> false testimony claims cited as exculpatory evidence are:

1. Police report of Jim Malone, Exhibit 10;

2. Victim-Witness Information notes, Exhibit 11;

3. Assistant District Attorney ("ADA") Jim Milam's letter to Detective Lawrence, dated August 5, 1998, Exhibit 12;

4. Investigative Request Form of ADA Lisa Naylor, Exhibit 13;

5. Case Notes of ADA T.J. Haycox, Exhibit 14;

6. Handwritten notes on interview of Kevin Childs of March 21, 2000, Exhibit 15;

7. Handwritten notes on interview of Kevin Childs on May 14, 2000, Exhibit 16;

8. Memorandum and attached bank records, Exhibit 17;

9. Excerpts of the trial testimony of Myra Christmon and Thomas Ward at Petitioner's trial, Exhibit 18;

10. Excerpt of Thomas Ward's testimony at the Barnes trial, Exhibit 19; and

11. Corey Watkins Supplemental Interview Report, Exhibit 20.

(Docket Entry No. 34-1 through 34-11)). Several of these documents are involved in a single <u>Brady</u> claim.

Rayburn McGowan, Petitioner's trial counsel, testified at the federal evidentiary hearing that he filed a motion for all <u>Brady</u> material, but the State did not produce any of the above listed documents. McGowan opines that these documents could have assisted him at trial in his cross-examination of Myra Christmon to challenge her credibility on whether her son was in actual

possession of valuable items that formed the basis for the robbery component of Petitioner's felony murder conviction. Although McGowan asserts that these documents were not produced, McGowan conceded that the state prosecutors provided the names of Kevin Childs, Michael Childs and Corey Watkins who are mentioned in these documents and whom the police officers interviewed. The state prosecutor and McGowan had difficulty locating witnesses for Petitioner's trial. McGowan also stated that a hearing was held on his amended motion for a new trial at which Watkins testified. In addition, prior to Petitioner's trial, McGowan acquired Myra Christmon's bank account records in a related civil action in which McGowan cross examined Myra Christmon.

### 1. The Credit Union Records

As to the substantive information in these alleged <u>Brady</u> documents, Petitioner first cites credit union account documents to challenge Myra Christmon's purported pretrial statements in a report prepared by Jim Milam, an assistant district attorney. According to this Milam report, Christmon stated to Milam that "on Friday, May 22, she had taken her son's income tax refund check in the amount of approximately $474 and **deposited all but $175 of that amount in the Aladdin Industries Credit Union**. She had received $175 in cash which she had given to the victim upon her return home from work that day. She thinks that she can locate her credit union statement showing the deposit on that date and possibly the deposit slip as well." (Docket Entry No. 34-3 at 2) (emphasis added). According to Petitioner, the credit union account records do not show a deposit of $299 into Christmon's joint account with her son on May 22nd, but show a withdrawal of $300 solely from the mother's account. (Docket Entry No. 34-8 at 3, 4). According to Petitioner, at trial, Christmon changed her story to a withdrawal of $300 in cash from her account of which she gave her son $175 to buy shoes, citing Docket Entry 34-9, Christmon Trial Tr. at 11, 19, 28).

At trial, Myra Christmon testified that she withdrew some money from "his credit union that is listed in both of our names. So I got out some money for Tahitian," "$175.00." (Docket Entry No. 47-5 at 11, 18). The $300 withdrawal was the only withdrawal on either account in April or May 1998. Id. at 28. The prosecutor introduced these credit union records at trial. Id. at 30. Myra Christmon encircled a May 22nd $300 withdrawal from a credit union account that is listed under her name. (Docket Entry No. 34-8 at 3). The second page of the credit union account records reflects an account with Christmon's and the victim's name and a deposit of $1637 on May 15th with the handwritten notation "From his + my income tax." Id. at 4.

These records reflect two credit union accounts: Christmon's account and a second account with her and her son's names. These accounts appear related as the information under the heading "account number" for each account is a common heading of "525701BP". (Docket Entry No. 34-8 at 3-4). There was a difference in the date of Myra Christmon's deposit of the tax refund checks, May 15th and the murder date, May 22nd, but the tax refund checks were deposited into the Christmon's joint account with her son. Id. at 4. Myra Christmon's account record clearly reflects a $300 cash withdrawal on the day of her son's murder. Id. at 3.

## 2. The Victim's Jewelry

With the alleged conflict between Myra Christmon's pretrial statement and her trial testimony about the source of the cash given to her son on the day of the murder, Petitioner next contends that his trial counsel could have used this alleged conflict to challenge Christmon's other trial testimony that her son was wearing jewelry when he left her home on the evening of the murder. (Docket Entry No. 34-9, Christmon Trial Tr. at 11-14). Petitioner identifies Myra Christmon's pretrial interview with assistant district attorney Jim Milam, describing her son's jewelry and cash

on his person on the evening of the murder. Petitioner contends that these statements caused Milam to charge Petitioner with felony murder because Christmon's son's body was found without "the watch, ring or the cash." (Docket Entry No. 42 at 8; Docket Entry No. 34-3).

According to Milam's notes on his pretrial interview with Christmon, Christmon purportedly told Milam: "In addition to the money previously mentioned, Mrs. Christmon said that her son was wearing a gold watch with a dark brown facing on the night of the murder. She said she had given this watch to him as a birthday gift and that it was worth approximately $300. She also said that he was wearing a nugget ring with diamonds, worth $575, which she had given him for Christmas." (Docket Entry No. 34-3 at 3). At trial, Christmon testified that on the night of the murder, her son was wearing a necklace that her sister bought him, a $380 watch from Service Merchandise that she bought him for his birthday, a $528 gold ring that she purchased for Christmas and a diamond earring. (Docket Entry No. 47-5 at 13-14). On cross examination, Christmon explained that her son "always wore" "his ring and his watch." Id. at 25. On redirect, Christmon explained that her son had received a settlement for a personal injury. Id. at 26.

Aside from Christmon's testimony, Thomas Ward, the victim's stepfather, also testified at trial that his son "pretty much wore jewelry all the time". (Docket Entry No. 34-9 at 34-36). Petitioner's proof reflects that Kevin Childs, a friend of the victim, also told state prosecutors that the victim had a gold chain, a gold ring with a diamond and usually carried a $100 on his person. (Petitioner Hearing Exhibit No. 7).

### 3. The May 24, 1998 Interview

Petitioner next cites, as exculpatory or impeachment evidence, the May 24, 1998 police interview of Myra Christmon and Thomas Ward at the Christmon residence. (Docket Entry No. 34-1,

Malone Report). According to this report, Ward "reluctantly" admitted Myra Christmon owned a white Nissan. Id. Myra Christmon stated that her son drove the Nissan, but neither Christmon nor Ward revealed their son's name or the last time they saw him. Id. This report describes Christmon and Ward as "very evasive." Id. Ward reviewed a photograph and identified their son. (Docket Entry No. 34-9, Ward testimony at 34).

Pamela Anderson, the state trial prosecutor, testified at the federal hearing and explained that this interview occurred before Christmon and Ward were aware of their son's death. In Anderson's experience, persons are wary of police officers' questions in a vacuum without specific facts. Once aware of their son's death, Christmon and Ward responded and cooperated with the State. Upon the review of the record and as detailed below, Christmon and Ward provided multiple interviews with state prosecutors and police officers that establish their cooperation.

### 4. The June 1, 1998 Interview

Petitioner's next exculpatory or impeachment evidence is the document, reflecting the June 1, 1998 interview of Christmon and Ward, by a victim-witness advocate in which the victim's parents purportedly stated that they did not believe their son was involved in drugs and contended that their son "was set up." (Docket Entry No. 34-2, Victim-Witness Notes). According to the advocate, for the perpetrators of their son's murder, Ward and Christmon wanted "the death penalty or life w/out parole." Id. The Court credits the undisputed testimony of Pamela Anderson, the state trial prosecutor, who explained that this document is prepared by a separate part of her office and was not a part of her file until after Petitioner's trial.

### 5. The August 3, 1998 Interview

Petitioner next cites Assistant District Attorney Jim Milam's letter summarizing his August 3, 1998, interview of Ward and Christmon with Detective Lawrence. According to Milam's letter, Christmon and Ward told him that Corey Watkins, who had been with their son earlier on May 22nd, may have their son's missing pager because Watkins was calling the victim's girl friend on a private line and that private number was on their son's pager. (Docket Entry No. 34-3 at 2). According to Milam, Ward and Christmon also referred to Michael Childs, a friend of their son, who told them that "Jerry Barnes had called him and told him to come to the motel, because he had beat somebody down and had a car for sale." Id. at 3. The victim's parents also purportedly stated that Kevin Childs, Michael Childs's brother, told them that "Barnes said he had taken some money off a guy and had a homicide on his hands." Id.

According to Petitioner, the police investigation did not substantiate the parents' assertion that Watkins was using their son's pager after his death. Petitioner cites that Barnes's admission that the pager was "broke, tore up. We tore it up." (Docket Entry No. 59-2, Barnes's recorded statement, at 20). Petitioner also contends that these statements are exculpatory because Michael Childs denied any contact with Barnes or Petitioner about the time of the victim's death and Kevin Childs denied that Barnes had made "any incriminating statements" to him. (Docket Entry No. 42 at 8; Docket Entry No. 34-5). Further, Petitioner cites the State's letter dated March 21, 2000, informing his defense counsel that "the State may call the following additional witnesses at trial: (1) Corey Watkins, 5646 Amalie Drive; (2) Kevin Childs, 420 Lincoya Bay, Donelson, Tennessee; [and] (3) Michael Childs, 5099 Linbar Drive, Apartment D-44." Petitioner contends that this letter misled his counsel to believe that these witnesses had relevant information for the prosecution. (Docket Entry No. 59-4, Naylor letter to McGowan).

First, as to the statements about Watkins, Myra Christmon's trial testimony was that at about 9:30 p.m. her son received a telephone call from a "young man," but she did not know the caller's identity. (Docket Entry No. 34-9, Christmon, Trial Tr. at 12). Milam's letter summarized that the victim's parents stated that after this call, their son stated that "he would be back shortly after he went to Corey's." (Docket Entry No. 34-3 at2). Milam explained that the reference to Corey Watkins as the caller was either an inference that either he or Christmon and/or Ward made based upon the victim's reference to Corey Watkins after the call. (Docket Entry No. 54 at 82-83). There is not any reference in the trial testimony of Christmon or Ward that either knew who called their son or where their son was going when he left their home. (Docket Entry No. 34-9). This assertion was also an inference based upon Watkins's telephone calls to the victim's girlfriend's private line that was on the victim's pager.

Second, the reference to Kevin Childs's alleged denial of hearing any incriminating statements by Barnes is inaccurate. The cited state document prepared by a state prosecutor reflects that the prosecutor actually spoke with Craig Myrick, Kevin Childs's counsel, who responded that "[h]e [Kevin Childs] saw Jerry Barnes at some apartments shortly after the murder and saw the bite mark on Barnes's thumb. He [Kevin Childs] **does not remember the defendant making any incriminating statements."** (Docket Entry No. 34-5 at 2) (emphasis added). Notes on another interview with Kevin Childs reflect that Kevin Childs purportedly stated that when he saw Barnes who was "probably" in the victim's vehicle, Barnes had an injured thumb and Barnes stated that he "got into it" with someone, but did not identify the victim as the other person. (Docket Entry No. 34-6 at 2). In their trial testimony, neither Ward nor Christmon mentioned Michael or Kevin Childs.

The final document concerns the interview of Corey Watkins who purportedly stated that Myra Christmon knew of her son's drug dealing and the amount of the drugs. (Docket Entry No. 34-11 at 2). The Watkins's interview report refers to Christmon returning drugs that she discovered in her home to her son because of the amount of money that volume of drugs represented. Id. At trial, on cross examination, Christmon denied any knowledge that her son used drugs. (Docket Entry No. 47-5 at 21). When questioned about whether she knew that her son associated with persons who sold drugs, the state trial court sustained the State prosecutor's objection on relevancy grounds. Id. Thomas Ward, the victim's stepfather who lived with Christmon and the victim, testified that he was unaware of whether his son used drugs. Id. at 36.

## C. Conclusions of Law

AEDPA's one-year statute of limitations commences from "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)(1)(D). Under Banks, discovery of Brady material may excuse a procedural default and render a habeas claim timely under Section 2244(d)(1)(D). Banks, 540 U.S. at 692-98. In such instances, "[t]he proper task ... is to determine when a duly diligent person in petitioner's circumstances would have discovered [the factual predicate behind his new-found evidence]." DiCenzi v. Rose, 452 F.3d 465, 470 (6th Cir. 2006) (quoting Wims v. United States, 225 F.3d 186, 190 (2d Cir. 2000)). Yet, where "a defendant 'knew or should have known the essential facts permitting him to take advantage of any exculpatory information' or where the evidence is available to defendant from another source", the Brady claim is time-barred. United States v. Clark, 928 F.2d 733, 738 (6th Cir.1991) (citation omitted).

31

Petitioner bears the burden of proving "only 'due,' or reasonable diligence" rather than "the maximum feasible diligence." DiCenzi, 452 F.3d at 470 (quoting Granger v. Hurt, 90 Fed. Appx. 97, 100 (6th Cir. 2004) (internal quotation marks omitted)). Petitioner's assertions of due diligence must be supported by facts. Starns v. Andrews, 524 F.3d 612, 618 (5th Cir. 2008). Section 2244(d)(1)(D)'s due diligence requirement focuses "on the petitioner's responsibility to identify the factual basis for his habeas claim in [a] timely fashion." Earl v. Fabian, 556 F.3d 717, 727 (8th Cir. 2009). Once the factual predicate could have been discovered, the due diligence issue is moot, and the Petitioner simply has one year to file his federal habeas petition. Id.

### 1. The Due Diligence Requirement

Here, the threshold issue is the date when, by exercise of due diligence, Petitioner "could have discovered" the factual predicatesw for his Brady and related Giglio claims. Humphreys v. United States, 238 Fed. Appx. 134, 139–40 (6th Cir. 2007); Aron v. United States, 291 F.3d 708, 711 (11th Cir. 2002). But see Rinaldi v. Gillis, No. 05–2101, 248 Fed. Appx. 371, 380 (3d Cir. 2007) (limitation period commences when the petitioner received the alleged Brady material). In Aron, the Eleventh Circuit explained the two-step inquiry for newly-discovered evidence claims:

> The government emphasizes that the one-year limitation period of [§ 2244(d)(1)(D)] begins to run when the facts *could have been* discovered through the exercise of due diligence, not when they were *actually* discovered. This is indeed the language of the statute; the beginning of the one-year period is triggered by a date that is not necessarily related to a petitioner's actual efforts or actual discovery of the relevant facts. Of course, if a court finds that a petitioner exercised due diligence, then the one-year limitation period would begin to run on the date the petitioner actually discovered the relevant facts, because the dates of actual and possible discovery would be identical. But if the court finds that the petitioner did not exercise due diligence, the statute does not preclude the possibility that the petitioner's motion could still be timely under [ § 2244(d)(1)(D) ]. For example, if the court concludes that, with the exercise of due diligence, the relevant facts could have been discovered two months earlier than the petitioner (who it finds did not exercise due diligence) actually discovered them, then the motion would still be timely if filed within ten months of the date

of actual discovery. Nonetheless, the court should begin the timeliness inquiry under [§ 2244(d)(1)(D) ] by determining whether the petitioner exercised due diligence because, as previously noted, if he did so, the limitation period would not begin to run before the date he actually discovered the facts supporting the claim.

291 F.3d at 711 (emphasis in original and footnote omitted).

The Sixth Circuit acknowledges the "reality of the prison system," Granger, 90 Fed. Appx. at 100, and that a State's misrepresentations may hinder a prisoner's due diligence search. Willis v. Jones, 329 Fed. Appx. 7, 16–17 (6th Cir. 2009). Yet, the habeas petitioner must be unaware of the basis of his claims, as required by § 2244(d)(1)(D), during the time prior to the running of the limitations period. Id.; Smith v. Bell, 381 Fed. Appx. 547, 552 (6th Cir. 2010); Starns, 524 F.3d at 619; Spirko v. Mitchell, 368 F.3d 603, 610 (6th Cir. 2004). As the Sixth Circuit noted, "a state could conceivably violate Brady in a way that would be easily discoverable by a duly diligent petitioner." Willis, 329 Fed. Appx. at 17.

To be sure, Petitioner's ignorance of the law alone is not grounds for tolling. Griffin v. Rogers, 399 F.3d 626, 637 (6th Cir. 2005). Under Tennessee law, upon the conclusion of Petitioner's post-conviction proceedings, Petitioner could obtain access to the state prosecutor's file. Appman v. Worthington, 746 S.W.2d 165, 166-67 (Tenn. 1987). Petitioner could have pursued access for discovery in his state post-conviction proceedings. Tennessee case law and statutes authorize discovery in state post-conviction proceedings. See Tenn. Code Ann. § 40-30-109(b); Tenn. R. Crim. P. 16 and Tenn. Sup. Ct. Rules, Rule 28, §6. Under Tennessee habeas corpus statutes, a party can petition the presiding trial court to issue subpoenas. Tenn. Code Ann. § 29-21-121(a). Yet, in Willis, the Sixth Circuit held that reasonable due diligence does not require a petitioner to inquire of the State immediately after conviction, if the State had withheld Brady documents during the trial. 329

Fed. Appx. at 17. There, the petitioner's claim was deemed timely under § 2244(d)(1)(D) because the petitioner lacked any reason to know the factual predicate of his Brady claims, could not have known that the State had withheld Brady material, and was entitled to rely upon the State's representation that such material was not in its possession. Id. at 16–17; see also Smith v. Bell, 381 Fed. Appx. 547, 552 (6th Cir. 2010).[5] As the Sixth Circuit explained:

> Where the prosecution had downplayed the significance of exculpatory testimony it had received from a witness, the fifth circuit held that the habeas petitioner's due diligence time period did not begin to run until he actually discovered the witness's testimony, even though the petitioner's attorney declined to follow up on the little he learned from the State before trial. Starns v. Andrews, 524 F.3d 612, 614, 619 (5th Cir.2008). The Seventh Circuit suggested that the due diligence period begins to run for uncovering exculpatory Brady evidence after the defendant contacts a witness who cooperates in revealing the state's wrongdoing. Daniels v. Uchtman, 421 F.3d 490, 490-91, 492 (7th Cir.2005). An unpublished Third Circuit opinion noted that "AEDPA's one-year clock did not begin ticking until the day [the petitioner] received the alleged Brady material." Rinaldi v. Gillis, 248 Fed.Appx. 371, 380 (3d Cir.2007).

> It is not necessary to decide today whether a state's Brady violation should always toll AEDPA's statute of limitation- a state could conceivably violate Brady in a way that would be easily discoverable by a duly diligent petitioner. But in the circumstances of this case, Willis was entitled to rely on the state's representation that it did not have impeaching evidence in its file, meaning that due diligence did not require him to request the records before the state turned them over.

Id. at *17. In Willis, the Sixth Circuit further observed that:

> It is also not necessary to decide whether Willis has proved all the elements of a Brady violation required to warrant habeas relief-Willis and the state can argue on remand about whether the state's eyewitness-based case against Willis was so strong that Willis was not prejudiced by the state's failure to disclose the impeaching material. See Strickler, 527 U.S. at 289-97, 119 S.Ct. 1936. Whether Willis can show prejudice is not relevant to this court's analysis at this stage of the litigation because the present question is when the AEDPA statute of limitations started running. Because the limitations period did not begin to run until

---

[5] In Willis, the Sixth Circuit noted that where the relevant evidence was within his knowledge before the AEDPA limitations period ran, petitioner's claims were time-barred. 329 Fed. Appx. at 10 n.3, 18.

Michigan disclosed the evidence, the district court must consider Willis's habeas claim on the merits.

Id.

Upon review of the record, the undisputed facts are that Petitioner's trial counsel filed a Brady motion and the state prosecutor did not produce any of these documents. In some respects, the documents cited by Petitioner are arguably Brady or Giglio materials. Petitioner learned of the existence of these documents in 2013 through his counsel in this action. Thus, applying Willis, the Court concludes that Petitioner has satisfied the due diligence requirement for his Brady and related Giglio claims.. Thus, the Court deems these claims to be timely filed under § 2244(d)(1)(D) of the AEDPA.

Yet, Petitioner's claims based upon alleged inadequacies of his trial and post-conviction counsel are untimely and Petitioner's proof does not warrant equitable tolling for those claims. Keeling v. Warden, 673 F.3d 452, 462 (6th Cir. 2012). Petitioner's claims for the alleged inadequacies of his trial counsel were asserted in Petitioner's December 20, 2004 state post-conviction petition, (Docket Entry No. 24-1 at 4) and in his February 2005 amended post-conviction petition (Docket Entry No. 24-3 at 1-2). These allegations reflect claims known to Petitioner in 2005. Thus, the Court concludes that Petitioner's ineffective assistance of counsel claims do not qualify for equitable tolling as those claims were known to Petitioner long before the habeas limitations period. Section 2244(d)(1)(D) requires the habeas petitioner to be unaware of the basis of his claims during the time prior to the expiration of the limitations period. Willis, 329 Fed. Appx. at 16–17. The Court concludes that these claim do not satisfy the due diligence requirement and are time barred.

## 2. **Brady** and **Giglio** Claims

Where a prosecutor withholds exculpatory material from the defense, the prosecutor violates the defendant's right to due process as established in Brady v.Maryland, 373 U.S. 83, 87 (1963). The Brady doctrine encompasses impeachment material. Giglio v. United States, 405 U.S. 150, 153-55 (1972). For a Brady claim, Petitioner must make some showing that proves that the State suppressed evidence. United States v. Warshak, 631 F.3d 266, 300 (6th Cir. 2010). Petitioner must prove "(1) that the evidence was favorable to him, (2) that it was suppressed (whether intentionally or not) by the government, and (3) that prejudice ensued." Jamison v. Collins, 291 F.3d 380, 385 (6th Cir. 2002). As to the merits of this Brady claim, the Sixth Circuit reiterated the evidentiary requirements to obtain any habeas relief:

> Brady requires the prosecution to disclose exculpatory and impeachment evidence that is material either to guilt or to punishment. The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A Brady violation has three elements: (1) the evidence must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) the evidence must have been suppressed by the state, either willfully or inadvertently; and (3) prejudice must have ensued.

Jalowiec v. Bradshaw, 657 F.3d 293, 302–03 (6th Cir. 2011) (quoting Beuke v. Houk, 537 F.3d 618, 633 (6th Cir.2008) (internal quotation marks and citations omitted)). Yet, "Brady does not apply when the defendant 'knew or should have known the essential facts permitting him to take advantage of any exculpatory information.'" Owens v. Guida, 549 F.3d 399, 417 (6th Cir. 2008) (quoting Coe v. Bell, 161 F.3d 320, 344 (6th Cir. 1998)).

In addition, "the knowing use of false testimony to obtain a conviction violates due process regardless of whether the prosecutor solicited the false testimony or merely allowed it to go uncorrected when it appeared." United States v. Bagley, 473 U.S. 667, 679 n.8 (1985). This doctrine

36

applies when "the prosecution knew, or should have known, of the perjury." United States v. Agurs, 427 U.S. 97, 103 (1976). In such cases, the judgment "must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." Id. (citing Giglio, 405 U.S. at 154). As to whether a prosecutor failed to correct false testimony, Petitioner must prove that: (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false. Coe v. Bell, 161 F.3d 320, 343 (6th Cir.1998). Petitioner's burden is to show that the testimony was actually perjured, United States v. Griley, 814 F.2d 967, 971 (4th Cir.1987), and was "'indisputably false' testimony." Rosencrantz v. Lafler, 568 F.3d 577, 585 (6th Cir 2009). "A conviction obtained by the knowing use of perjured testimony must be set aside if 'the false testimony could ... in any reasonable likelihood have affected the judgment of the jury.'" Id. at 583 (citation omitted). If there is any reasonable likelihood that the government knowingly relied on perjury to obtain a guilty verdict, reversal is required. Knighton v. Mullin, 293 F.3d 1165, 1174 (10th Cir. 2002).

The Court addresses each of the Petitioner's Brady claims and related Giglio claims and evaluates Petitioner's proof on these claims in light of the state courts' findings about the facts underlying Petitioner's conviction.

### a. The Credit Union Records Claim

As to the alleged conflict between Christmon's pretrial statement to the state prosecutor and her trial testimony, contrary to Petitioner's characterization, Christmon's pretrial statement never identified the specific credit union account from which on May 22, 1998, she withdrew the $300 in cash given to her son. According to this interview report, Myra Chrsitmon stated that the cash

came from "the Aladdin Industries Credit Union". (Docket Entry No. 34-3 at 2). To be sure, Christmon's purported pretrial statement refers to the source of the funds as her and her son's tax refund checks that she deposited in their joint account. (Docket Entry No. 34-8 at 4). The record of this joint account with her son reflects a deposit of their income tax refund checks into their joint account. Id. In her pretrial interview, Christmon referred to her account records for her statements about these transactions. The tax refunds deposits were on May 15th, seven days prior to the murder on May 22nd. Id. Petitioner's trial counsel had these records when he examined Myra Christmon in a deposition in a civil action. These credit union records are documentary evidence that corroborates the victim's mother's pretrial statement and trial testimony that she gave her son cash on the day of the murder

Upon consideration of the jury verdict and state courts' findings, the Court concludes that this purported discrepancy is immaterial and that this Brady claim lacks merit.

### b. The Missing Jewelry Claim

Petitioner's next claim is that with the asserted conflict in Christmon's pretrial statement and trial testimony about the source of the money from the credit union accounts, Petitioner could have used that conflict to impeach Myra Christmon on another issue. That issue concerns Myra Christmon's testimony that on the day of the murder, her son was also wearing a watch, diamond earring and a gold ring. In one instance, Petitioner describes this Brady claim as based upon the absence in the state prosecutors' file of records that "Mrya Christmon actually did purchase these supposed gift items." (Docket Entry No. 42 at 9). Petitioner also cites that Myra Christmon did not testify in Barnes's trial, suggesting the contradictions in her testimony and her deposition testimony as a reason. (Docket Entry No. 61 at 13, citing Docket Entry No. 59-5, -6, Barnes's trial transcript).

First, as stated above, the credit union records corroborate the victim's mother's testimony that she gave her son cash on the day of the murder. For the reasons stated about the credit union claim above, the Court does not discern the source of the cash as a material conflict for Brady purposes.

As to the jewelry, aside from Christmon's testimony, Thomas Ward, the victim's stepfather also testified that his son "pretty much wore jewelry all the time." (Docket Entry No. 34-9 at 35-36). Petitioner's proof reflects that Kevin Childs, a friend of the victim, also told state prosecutors that the victim had a gold chain, a gold ring with a diamond and usually carried $100 on his person. (Petitioner Hearing Exhibit No. 7). The State's proof also included proof from Charles Blackwood, Jr., who "testified that he is a member of the Forensics and Firearms Unit within the Identification Unit of the Metropolitan Police Department ... [and] stated that the victim had an injury to his right index finger." Eakes, 2003 WL 21523244, at *7-8. The victim's pockets were turned inside out. Id. at *17. Detective Lawrence testified that a piece of a "chain of some type," was found in room 143 of the Motel 6 where the victim was killed. Id. at *18. The victim was also missing his shoes. Id. These facts are corroborative evidence that the victim was wearing jewelry on the evening of the murder. The State's proof also included Petitioner's admission that he struck the victim and assisted Barnes in suffocating the victim and disposing of the victim's body. Id. at *9, 17. As the Tennessee appellate court found:

> Even absent the evidence that the victim possessed a wallet, jewelry, and cash
> prior to the violent struggle in the motel room, **the condition of the victim's pants**
> **pocket (inside out), the piece of chain jewelry [found on the floor of the motel**
> **room], and the missing shoes are strong circumstantial evidence of an attempted**
> **robbery. It is certainly possible that the jury inferred that the Defendant and**
> **Barnes thought the victim kept his cash or other items of value in his shoes.** We
> conclude that the jury could have reasonably inferred that the Defendant and

Barnes killed the victim and took the victim's possessions from his person by violence, and thus committed murder in the perpetration of or attempt to perpetrate a robbery.

Id. at *18 (emphasis added).

The Petitioner admitted that he and Barnes disposed of the victim's body in a remote area. Id. at *8, 17, 18. One officer testified that it was highly unlikely that absent help from Barnes, anyone would have found the victim's body and vehicle. Thus, the Court concludes that the state courts could reasonably conclude that it was extremely unlikely that persons other than Barnes and the Petitioner would have found the vehicle, opened the trunk, and stolen the victim's possessions. These collective facts are strong circumstantial evidence of an attempted robbery from which the state courts and the jury could reasonably conclude that the Petitioner and Barnes robbed the victim of his cash, jewelry, watch and shoes as part of the murder. These facts do not undermine the confidence in the jury's verdict for relief as required for a successful Brady claim.

### c. The May 24, 1998 Interview Claim

For this claim, Petitioner cites the interviewing officer's characterizations of the victim's parents' responses to his questions as "very evasive" and that the parents "reluctantly" admitted to their son's ownership of the white Nissan vehicle. The Court credits state prosecutor Pamela Anderson's undisputed testimony that this interview occurred before Christmon and Ward were aware of their son's death. In Anderson's experience, persons are wary of police officers' questioning in a vacuum without specific facts. Once aware of their son's death, Christmon and Ward responded and cooperated with the State, as reflected in their multiple interview reports. Based upon the Court's review of the record, the Court concludes that this claim is without merit.

### d. The June 1, 1998 Interview Claim

This claim cites the victim's parents' contention that their son was "set up" and that Petitioner should get the death penalty or a life sentence without parole. Inasmuch as the proof shows that this statement was taken after trial by a victim advocate who was in a separate part of the District Attorney's office. This interview was unknown to the state trial prosecutor until after Petitioner's trial. Thus, the Court concludes that considered with the entire state record, these purported statements of the parents do not qualify as Brady material. This claim lacks merit.

### e. The August 3, 1998 Interview Claims

For this claim, Petitioner cites statements by the victim's parents about Kevin and Michael Childs, as well as Corey Watkins, that the police did not corroborate, thereby rendering those statements Brady or Giglio material. In this pretrial statement, the victim's parents purportedly referred to Michael Childs as telling them that Barnes called and told Michael Childs that he had a car for sale at the motel. This interview also cites the victim's parents as stating that Kevin Childs told them that Barnes made an incriminating statement to him about the victim's murder.

As to the parents' purported statements about Watkins, Milam testified that this reference to Corey Watkins as the caller was either an inference that either he or Christmon and/or Ward made based upon the victim's reference to Corey Watkins shortly after the call. There is not any reference in the trial testimony of Christmon or Ward that either knew who called their son or where their son was going when he left their home. (Docket Entry No. 34-9). The state prosecutor's assertion about Watkins was plainly an inference by the victim's parents and/or him based upon the victim's reference to Watkins right after the telephone call and before the victim left his residence on May 22nd. The second purported inference by the victim's parents is based upon Watkins's purported calls to the victim's girl friend on her private line that was on the victim's pager. The Court

concludes that these statements do not qualify as material under Brady standards and do not render the parents' trial testimony false as required by Giglio.

As to the alleged conflict between the victim's parents' statements during this interview about Michael and Kevin Childs and their trial testimony, neither Ward nor Christmon mentioned Michael or Kevin Childs in their trial testimony. Contrary to Petitioner's characterization, the interview report's reference to Kevin Childs was a statement of his counsel, not Kevin Childs. In addition, Childs's counsel's statement is that his client did not remember any incriminating statement that Barnes made to him, not a denial of such statements. The Court does not discern how these purported statements are favorable to Petitioner who admitted that he was acting in concert with Barnes to strangle the victim and hide the victim's body and vehicle. The Court concludes that these Brady contentions lack merit.

The only cited exculpatory evidence is the interview of Corey Watkins who stated that the victim told him that his mother was aware that Petitioner dealt in drugs. (Docket Entry No. 34-11 at 2). Petitioner contends that this statement is Brady material and that his trial counsel could have utilized the Watkins interview report to impeach the mother's trial testimony about giving her son $175 in cash on the evening of his murder. Watkins was a witness at the hearing on Petitioner's motion for a new trial and there is not any evidence that Watkins so testified.

As to the impact of this interview report, Petitioner admitted that he acted in concert with Barnes in murdering the victim and disposing of the victim's vehicle. These admissions, coupled with the State's other proof, undermines any material exculpatory value to Watkins's purported statements about Christmon's alleged knowledge of her son's drug use. As to the State's proof of

the felony murder aside from the $175 in cash, the Tennessee appellate court summarized the other

facts:

> We conclude that the evidence of robbery was sufficient to support a conviction for felony murder in this case. The victim's mother testified that when the victim left home around 9:45 p.m. on May 22, 1998, he was wearing a pair of Michael Jordan shoes and several items of jewelry, including his ring, his watch, and his diamond earring. She stated that he usually carried his wallet with his driver's license in it. Finally, she stated that she had given the victim $175 in cash around 4:00 p.m. The Defendant left his home in a 1992 Nissan Sentra that was titled in his mother's name. Thomas Ward, the victim's stepfather, testified that the victim "pretty much wore jewelry all the time."

> The evidence presented at trial established that at approximately 10:30 p.m., a mere forty-five minutes after the victim left his home, there was an altercation at the Motel 6 involving the victim, the Defendant, and Jerry Barnes. Tracy Rosser, the manager of the Motel 6, testified that she returned from dinner around 10:30 p.m.. She stated that as she was taking another guest to a room, she noticed that the curtain was partially down in room 143. Rosser reported that after knocking on the door several times, Jerry Barnes came to the door and acknowledged that there had been some sort of fight in the room. The Defendant admitted in a taped statement that he helped Jerry Barnes strangle the victim in the hotel room, and that this occurred just before Rosser came to the room.

> With the assistance of Jerry Barnes, the victim's body was located two days after the murder in a very remote area of Rutherford County. Charles Blackwood, an identification officer, testified that he was present when the victim's body was located, and he observed that the victim's pants pockets had been turned inside out. He further stated that no items of jewelry were recovered, and the victim was not wearing any shoes or socks. The victim's mother confirmed that the none of the victim's jewelry, his wallet, or his shoes were found on or with the victim's body.

> . . .

> Here, the Defendant was indicted for felony murder "during the perpetration or *attempt to perpetrate* robbery." (Emphasis added.) In this case, the victim's mother testified that the victim left home at 9:45 p.m., wearing various items of jewelry and an expensive pair of tennis shoes. She also testified that she had just given the victim $175 in cash. She stated that the victim always carried his wallet with him when he left the house.

There is overwhelming evidence that a mere forty-five minutes after the victim left his home wearing the jewelry, and presumably carrying a wallet with $175 in cash, the victim was involved in a violent struggle with the Defendant which resulted in the victim's death. The Defendant admitted that he and Barnes disposed of the victim's body in a remote area. One officer testified that it highly unlikely that absent help from Barnes, anyone would have found the victim's car. Thus, it was extremely unlikely that persons other than Barnes and the Defendant would have found the vehicle, opened the trunk, and stolen the victim's possessions from his corpse. When the victim's body was found, his jewelry, wallet, and shoes were missing. In addition, one of the victim's pants pockets was turned inside out. Detective Lawrence testified that a piece of some form of jewelry, specifically a "chain of some type," was found in room 143 of the Motel 6. Even absent the evidence that the victim possessed a wallet, jewelry, and cash prior to the violent struggle in the motel room, the condition of the victim's pants pockets (inside out), the piece of chain jewelry, and the missing shoes are strong circumstantial evidence of an attempted robbery. It is certainly possible that the jury inferred that the Defendant and Barnes thought the victim kept his cash or other items of value in his shoes. We conclude that the jury could have reasonably inferred that the Defendant and Barnes killed the victim and took the victim's possessions from his person by violence, and thus committed murder in the perpetration of or attempt to perpetrate a robbery.

Eakes, 2003 WL 21523244 at *17-18.

In consideration of the facts found by the state appellate court, the Court concludes that this Brady claim, based upon Watkins's alleged statement about the victim's mother, does not constitute material exculpatory facts nor cast a reasonable doubt or a lack of confidence in the jury's verdict. In sum, the Court concludes that none of the Brady documents cited by Petitioner contains favorable information and that the cited information is not material as substantive evidence or for impeachment purposes. The Court also concludes that these materials do not establish any false testimony at Petitioner's trial nor cast any doubt as to jury's verdict and Petitioner's conviction.

### 3. Actual Innocence Exception

Petitioner's related claim is that his proof establishes his actual innocence and would warrant tolling the AEDPA's statute of limitations and habeas relief. Souter v. Jones, 395 F.3d 577,

589-90 (6th Cir. 2005). For a time-barred claim to qualify for this actual-innocence exception, the "habeas petitioner can demonstrate that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying constitutional claims." Id. at 602. The "actual innocence 'does not merely require a showing that a reasonable doubt exists in the light of the new evidence, but rather that no reasonable juror would have found the defendant guilty.'" Cleveland v. Bradshaw, 693 F.3d 626, 633 (6th Cir.2012) (quoting Schlup v. Delo, 513 U.S. 298, 329 (1995)).

In this context, "'actual innocence' means factual innocence, not mere legal insufficiency." Bousley v. United States, 523 U.S. 614, 623 (1998). "[A] credible claim of actual innocence is extremely rare," Souter, 395 F.3d at 600, and "the actual innocence exception should 'remain rare' and 'only be applied in the extraordinary case.' " Id. at 590 (quoting Schlup, 513 U.S. at 321). Moreover, "[t]his 'gateway actual innocence claim' does not require the granting of the writ, but instead permits the petitioner to present his original habeas petition as if he had not filed it late." Perkins v. McQuiggin, 670 F.3d 665, 670 (6th Cir. 2012). Examples of "new reliable evidence" are "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." Schlup, 513 U.S. at 324. In assessing such proof, "the habeas court must consider 'all the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial.'" House v. Bell, 547 U.S. 518, 538 (2006) (quotation marks omitted) (quoting Schlup, 513 U.S. at 327–28); Bell v. Howes, 703 F.3d 848, 855 (6th 2012).

Based upon the Court's earlier findings and conclusions, the Court also concludes that Petitioner's proof does not satisfy the actual innocence standards for any habeas relief.

For these collective reasons, the Court concludes that this petition should be denied as without substantive merit.

An appropriate Order is filed herewith

It is so **ORDERED.**

**ENTERED** this the _____ day of January, 2014.

William J. Haynes, Jr
Chief United States District Judge