**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **WILLIAM EAKES III,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **NO. 3:10-cv-00367** |
| | ) | |
| **DAVID SEXTON, Warden,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Petitioner William Eakes, III is serving a sentence of life in prison after a jury convicted him of first-degree felony murder and second-degree murder when he was eighteen years old. In this federal habeas petition, which is before the Court for the second time, Eakes claims under Brady v. Maryland, 373 U.S. 83 (1963), that the prosecution deprived him of a fair trial by failing to disclose evidence relevant to the credibility of the prosecution's key witness. For the reasons discussed below, Court will reopen Eakes' petition for a writ of habeas corpus and will grant the writ.

## I.    Background

The history of this action spans over twenty years and multiple proceedings in state and federal courts. The portions of that history relevant to resolving the present motion are summarized below.

### A.    Eakes' Trial, Conviction, and Direct Appeal

This Court adopted in full the Tennessee Court of Criminal Appeals' findings of fact made in Eakes' direct appeal in its first consideration of Eakes' petition. (Doc. No. 65.) The Sixth Circuit summarized the relevant factual background from those proceedings in its opinion remanding the case, Eakes v. Sexton, 592 F. App'x 422, 424–26 (6th Cir. 2014) (Eakes I). Because this Court's

determination of Eakes' motion depends in large part upon what is mandated by the Sixth Circuit's prior decision and its application of the Brady standard in the context of those facts, its summary is provided in full:

> At approximately 9:30 p.m. on Friday, May 22, 1998, Tehition Christman left his parents' house in his white 1992 Nissan after receiving a phone call. Tehition told his parents that he would be back shortly after he went to Corey Watkins' house. That was the last time Myra Christman saw her son alive.

> At approximately 10:30 p.m. that night, Tracy Rosser, the manager of a Motel 6 just a few miles from the Christmans' home, knocked on the door of a room registered to Barnes (a 38–year old exterminator with a cocaine problem who was referred to by local drug dealers as "the bug man"). She noticed that some of the curtains had been ripped off the drapery hooks. She knocked on the door several times, to no avail. Finally, when she threatened to call the police if the door was not opened, Barnes opened the door just far enough to stick his head out. When she asked Barnes about the curtains, he said "they" were just having rough sex. She said the motel did not allow parties, and that if there were any disturbances from that room, they would have to leave.

> The next day, after Barnes had vacated the room, a housekeeper reported to the manager that he had found blood and other signs of a violent struggle in Barnes' room. Police, upon notification, examined and secured the room. They then went to Barnes' home where they found blood on his truck and bloody clothes in his washing machine. Police received information that Barnes routinely rented hotel rooms in the area (his wife would testify at trial that she did not allow him to do drugs at home in the presence of their children). On Sunday morning, police tracked down Barnes and Eakes at a Super 8 Motel near the Motel 6. Just as officers approached their room, Barnes and Eakes walked outside and, soon after, confessed to Tehition's murder.

> Both gave recorded confessions saying that Tehition had come to Barnes' room to sell them crack cocaine, Tehition and Barnes got into an argument over the amount of the cocaine, and the argument turned physical. Eakes stated that he became involved in the fight only when Barnes asked for help after Tehition started biting Barnes' thumb. Eakes said that he initially hit Tehition with a telephone, then went outside to the truck, got an axe, came back in, and hit Tehition in the back of the head with the blunt side of the axe. Eakes stated that his uncle started choking Tehition, and he helped by putting his hands over his uncle's hands and pressing down.

> Barnes guided police to where he had hidden Tehition's car and body, and Eakes showed them the location of the axe and the bloody hotel bedding. An autopsy showed that Tehition, at the time of death, was under the influence of cocaine.

When Tehition did not come home Friday night, Myra Christman knew that something was wrong because he did not respond to her numerous pages despite his habit of quickly responding to them. At midday on Sunday, however, when Officer Jim Malone went to Tehition's house inquiring about the white Nissan and who was driving it, Myra and Thomas Ward, Tehition's stepfather, were both "very evasive." (R. 69–1.) Despite the fact that Tehition had been missing for 36 hours, they refused to disclose Tehition's name and they refused to say at what time they had last seen him. Officer Malone memorialized this encounter in a report dated May 24, 1998. This report was never disclosed to Eakes.

On June 1, 1998, a Victim Advocate wrote the following comments in a report after interviewing Tehition's parents ten days after the murder:

> Victim's family can be a handful. They don't want to believe that vic was involved w/drugs. They believe he was set up and want both [defendants] to either get the death penalty or life w/out parole.

(R. 69–2.) This report was never disclosed to Eakes.

On August 3, 1998, Assistant District Attorney (ADA) James Milam, the first prosecutor on the case, interviewed Tehition's parents. Myra "did most of the talking," though each of the parents showed general agreement with what the other parent said. ADA Milam memorialized this interview in a letter to lead detective Johnny Lawrence. ADA Milam reported, among other things:

> [Myra] related that on Friday, May 22, she had taken her son's income tax refund check in the amount of approximately $474 and deposited all but $175 of that amount in the Aladdin Industries Credit Union. She had received $175 in cash which she had given to the victim upon her return home from work that day. She thinks that she can locate her credit union statement showing the deposit on that date and possibly the deposit slip as well.
>
> The significance is that the victim had this money with him when he left home around 9:45 after receiving a phone call from Corey Watkins.
>
> The parents recalled that the victim was watching a Chicago Bulls play-off game when the phone rang and that he told them he would be back shortly after he went to Corey's.

(R. 69–3 at 2.) Myra also told ADA Milam that when Tehition left, he was wearing a gold watch worth $300 that she had given him for his birthday and a $575 nugget ring with diamonds that she had given him for Christmas.

The Milam letter also reveals that Tehition's parents thought he was either set up by Corey Watkins or that Corey was somehow involved in Tehition's murder. They told ADA Milam that Corey lied about his contact with Tehition on the morning of his murder, and that Corey must have possessed Tehition's pager after his death because Corey had supposedly retrieved a private phone number off the pager and was using the pager to receive calls.

Finally, ADA Milam stated:

> The parents also reported that a man named Michael Childs, telephone number 226–6641, told them that Jerry Barnes had called him and told him to come to the motel, because he had beat somebody down and had a car for sale. This man's brother, Kevin Childs, who has the same phone number, supposedly told the parents that Barnes said he had taken some money off a guy and had a homicide on his hands.

(Id. at 3.) The Milam letter was never disclosed to Eakes.

Handwritten notes dated March 21, 2000 and found in the files of ADA T.J. Haycox, the second prosecutor on the case, state that when he interviewed Kevin Childs, Kevin denied that Barnes ever told him he murdered anyone stating, instead, that Barnes told him "he & guy had got into it & he beat him up (not that he killed him)." These notes were never disclosed to Eakes.

That same day, ADA Haycox typed up a report summarizing his case notes. With regard to his interview of Kevin Childs, he reported that he spoke to Kevin Childs who said that he saw Barnes at some apartments shortly after the murder and that he saw a bite mark on Barnes' thumb, but he did not remember Barnes making any incriminating statements. ADA Haycox further reported that the family refused to believe their son had anything to do with drugs despite the autopsy report and Tehition's criminal history. He reported that "the most likely scenario is that the victim came to deliver drugs, there was an argument which turned physical, and in the process Barnes and Eakes killed the victim." (R. 69–5.) He concluded that "[the parents] have larger ideas about the case than the facts support." (Id.) This document was never disclosed to Eakes.

In March 2000, Officer Rose Berne interviewed Michael Childs at ADA Lisa Naylor's request. (ADA Naylor assisted ADA Pamela Anderson at Eakes' October 2000 trial.) Officer Berne reported that Michael Childs denied having any contact with either Barnes or Eakes around the time of the murder. This report was never disclosed to Eakes.

Before trial, Eakes filed a motion seeking Brady material. None of the aforementioned documents were produced.

Eakes' trial was held in October 2000, well over two years after Tehition's murder. Myra Christman was the first witness, and the key witness on the subject of the robbery element necessary for the first-degree conviction. In very short order, she testified that, on the day of the murder, Tehition asked her for some money, so she took $300 out of a credit union account listed in both their names for herself and Tehition and gave Tehition $175. Myra also testified that "[a]round 9:30, my sister answered my telephone and someone had called Tehition. She said it was a young man but I don't know who." (R. 47–5 at 12.) When Eakes' counsel asked Myra whether she was aware that her son was into drugs, she responded, "No, sir." (Id. at 21.) And when he asked her if she had any knowledge of her son associating with people who sell drugs, ADA Anderson objected to that question, and the court sustained the objection—foreclosing any further inquiry by Eakes' counsel into the subject. Finally, Myra testified that when Tehition left the house that night, he had on a gold necklace, a $380 watch, a $528 gold ring with diamonds on it, a diamond earring, a $180 dollar pair of Michael Jordan shoes, and the $175 she had given him that day.

The jury found Eakes guilty of first-degree and second-degree murder, and he was sentenced to life in prison. His convictions were affirmed on appeal and his petition for post-conviction relief was denied.

Eakes I, 592 F. App'x at 424–26.

Eakes appealed his conviction, arguing that the evidence presented at trial was insufficient to convict him of first or second-degree murder. (Doc. No. 47-12.) On July 1, 2003, the Tennessee Court of Criminal Appeals (TCCA) affirmed the judgment of the trial court. (Id.) The Tennessee Supreme Court denied Eakes' request for permission to appeal on December 22, 2003. (Id.)

**B.      Eakes' State Post-Conviction Proceedings**

On December 20, 2004, Eakes filed a pro se petition for post-conviction relief in the Criminal Court for Davidson County, alleging that he had been denied the effective assistance of counsel at trial in violation of the Sixth and Fourteenth Amendments. (Doc. No. 47-13.) On January 25, 2005, the court found that Eakes' petition provided no factual allegations in support of his constitutional claims and that he had failed to verify the petition under oath. (Id.) The court gave Eakes thirty days to submit an amended petition remedying those deficiencies. (Id.) Eakes filed an amended petition on February 23, 2005, alleging that his trial counsel provided ineffective

assistance by failing to conduct an adequate investigation before Eakes' trial and by failing to prepare a clear defense theory. (Id.) Eakes also attempted to verify his petition. (Id.) On March 28, 2005, the court dismissed Eakes' amended petition, finding that Eakes' allegations remained too conclusory to warrant relief and that Eakes had failed to properly verify the amended petition. (Id.)

Eakes appealed the denial of post-conviction relief to the TCCA, which affirmed the dismissal of Eakes' petition on January 23, 2006. Eakes v. State, No. M2005-01016-CCA-R3-PC, 2006 WL 163637, at *1 (Tenn. Crim. App. Jan. 23, 2006). The Tennessee Supreme Court denied Eakes' request for permission to appeal on May 30, 2006. (Doc. No. 47-14.)

Eakes filed a second petition for state post-conviction relief on October 28, 2009. (Doc. No. 1-1.) The court denied that petition on November 2, 2009, finding the petition untimely and that Eakes was only entitled to file one petition for post-conviction relief under Tennessee law and had not demonstrated that it was appropriate to reopen his prior petition. (Id.) Eakes did not appeal the denial of his second post-conviction petition. (Doc. No. 8.)

### C.     Eakes' Federal Habeas Petition

Eakes filed a pro se petition for a writ of habeas corpus in this Court on December 30, 2009,[1] asserting that he had been denied effective assistance of counsel, that his convictions were obtained through a violation of the privilege against self-incrimination, that his convictions violated the Double Jeopardy Clause, and that the prosecution had failed to disclose unspecified evidence regarding statements that Barnes had made after Tehition was killed. (Doc. No. 8.) On May 27, 2010, the Court ordered Eakes to show cause why his petition should not be dismissed as untimely under 28 U.S.C. § 2244(d)(1)(A), which required Eakes to file his petition within one

---

[1]     This case was transferred to the undersigned on July 2, 2018.

year of the date on which his convictions became final. (Doc. No. 12.) Eakes responded by summarizing his post-conviction efforts in state court. (Doc. No. 14.)

The Court found that Eakes' federal habeas petition was untimely. (Doc. No. 15.) However, "[g]iven the preclusive effect of a dismissal and [Eakes'] life sentence," the Court appointed the Office of the Federal Public Defender to represent Eakes and gave him forty days to address the timeliness of his petition through counsel. (Id. at PageID# 64.) Ultimately, Eakes filed a motion for leave to file a second amended petition to include a Brady claim based on recently discovered exculpatory documents that the prosecution had not disclosed in the trial proceedings. (Doc. No. 36.) The Court granted Eakes leave to file the second amended petition and additional time to address equitable tolling based on the Brady claim. (Doc. Nos. 38, 41.)

Eakes filed his second amended petition on September 9, 2013, raising ineffective assistance of counsel, insufficiency of the evidence, and a Brady claim. (Doc. No. 42.) Eakes' Brady claim is based upon the prosecution's failure to disclose the following documents:

1. Officer Jim Malone's Report

At midday on Sunday, May 24, 1998, Tehition had been missing for 36 hours and his mother "knew something was wrong" because she had paged Tehition and he had not responded. (Doc. No. 47-5, PageID# 714.) By that time, Barnes had showed officers where he had hidden the white Nissan, and a detective dispatched Officer Jim Malone to Tehition's house to inquire about the vehicle. Malone memorialized this encounter in a police report. Malone first spoke to Thomas Ward, Tehition's stepfather, who "reluctantly" confirmed that Myra owned the white Nissan. (Doc. No. 34-1, PageID# 240.) Malone explained that he needed to speak to Myra to determine who had been driving the vehicle. Myra came to the door and stated that "her son" had the vehicle. Malone informed Myra and Ward that the vehicle was in police custody and that he needed to

7

know the identity of the person who was driving it. Malone's report states that Myra and Ward were "very evasive," refusing to provide Tehition's name or state when they had last seen him. (Id.)

2. The Victim Advocate's Report

On June 1, 1998, ten days after Tehition was murdered, a victim advocate interviewed Myra and Ward and recorded the following observations in a report:

> Victim's family can be a handful. They don't want to believe that [Tehition] was involved [with] drugs. They believe he was set up [and] want both [Barnes and Eakes] to either get the death penalty or life [without] parole.

(Doc. No. 34-2, PageID# 242.)

3. Assistant District Attorney James Milam's Letter

On August 3, 1998, Milam—the first prosecutor assigned to Eakes' case—conducted an interview of Myra and Ward, which he memorialized in a letter to lead detective Johnny Lawrence. The letter, dated August 5, 1998, provides the following summary of Myra and Ward's account of the events preceding Tehition's murder:

> [Myra] related that on Friday, May 22, she had taken her son's income tax refund check in the amount of approximately $474 and deposited all but $175 of that amount in the Aladdin Industries Credit Union. She had received $175 in cash which she had given to the victim upon her return home from work that day. She thinks that she can locate her credit union statement showing the deposit on that date and possibly the deposit slip as well.
>
> The significance is that the victim had this money with him when he left home around 9:45 after receiving a phone call from Corey Watkins.
>
> The parents recalled that the victim was watching a Chicago Bulls play-off game when the phone rang and that he told them he would be back shortly after he went to Corey's.

(Doc. No. 34-3, PageID# 244.)

8

According to the letter, Myra told Milam that, on the night Tehition was murdered, he was wearing a $300.00 gold watch and a $575.00 nugget ring with diamonds. Myra and Ward explained that they suspected that Watkins was somehow involved in Tehition's murder. They also reported "that a man named Michael Childs . . . told them that Jerry Barnes had called him and told him to come to the motel, because [Barnes] had beat somebody down and had a car for sale." (*Id.* at PageID# 245.) Myra and Ward claimed that they had a similar interaction with Kevin Childs— Michael Childs's brother—who "supposedly told the parents that Barnes said that he had taken some money off a guy and had a homicide on his hands." (*Id.*)

    4.   Notes and Reports on Interviews with Kevin and Michael Childs

Assistant District Attorney T.J. Haycox was the second prosecutor assigned to the case, and he interviewed Kevin Childs on March 21, 2000. According to Haycox's handwritten interview notes, Childs contradicted Myra and Ward's account, denying that Barnes confessed to having taken money off a guy he killed. Instead, Childs reported that Barnes told him that "[Barnes] & guy had got into it & [Barnes] beat [the guy] up . . . ." (Doc. No. 34-6, PageID# 252.) After the interview, Haycox typed up a formal report in which he noted that Childs did "not remember [Barnes] making any incriminating statements" after the murder. (Doc. No. 34-5, PageID# 250.) Haycox also wrote that Tehition's family "refuses to believe [Tehition] had anything to do with drugs" despite Tehition's criminal history and the autopsy lab work showing that Tehition was high on cocaine at the time he died. (*Id.*; Doc. No. 47-8.) Haycox opined that "the most likely scenario is that [Tehition] came to deliver drugs, there was an argument which turned physical, and in the process Barnes and Eakes killed [Tehition]." (Doc. No. 34-5, PageID# 250.) Haycox concluded by remarking that Myra and Ward "have larger ideas about the case than the facts support." (*Id.*)

On March 28, 2000, upon the request of Assistant District Attorney Lisa Naylor, Officer Rose Berne interviewed Michael Childs, who also contradicted Myra and Ward's account. Berne reported that Childs claimed that he did not have any contact with either Barnes or Eakes around the time of Tehition's murder. (Doc. No. 34-4.)

5. Myra's Credit Union Account Statement

On August 14, 1998, the prosecution obtained a copy of Myra's credit union account statement which showed that, on the day Tehition died, she had withdrawn $300.00. (Doc. No. 34-8.) This was inconsistent with Myra's earlier statement to Milam that she had deposited $299.00 of a $474.00 tax refund in the account and given the remainder to Tehition. Myra's credit union account statement was introduced at trial as an exhibit to corroborate her testimony.[2] (Doc. No. 47-5.)

The State moved to dismiss the second amended petition, arguing that Eakes' claims were time-barred and that Eakes' Brady claim failed because it was based on evidence that was not material to the case. (Doc. Nos. 44, 45.) The Court held an evidentiary hearing on September 20, 2013. (Doc. No. 54.) On January 3, 2014, the Court granted the State's motion to dismiss, denying all of Eakes' claims. (Doc. Nos. 65, 66.) The Court found that Eakes' non-Brady claims were time-barred and that Eakes' Brady claim failed on the merits. (Id.) The Court granted Eakes a certificate of appealability under 28 U.S.C. § 2253(c) on the Brady claim. (Doc. No. 66.) Eakes filed a notice of appeal on January 6, 2014. (Doc. No. 68.)

---

[2]    At this Court's evidentiary hearing on Eakes' Brady claim, discussed below, Eakes' trial counsel admitted that he had copies of the credit union account statement before Eakes' trial. (Doc. Nos. 54, 90.)

### D. Eakes' Appeal to the Sixth Circuit

On appeal, Eakes argued only that this Court erred when it found that the Brady material not disclosed to Eakes was not material. (Doc. Nos. 93-1, 93-2, 93-3.) In a November 25, 2014 opinion, the Sixth Circuit agreed. Eakes I, 592 F. App'x at 429. The Sixth Circuit first found that "Billy Eakes admitted to killing Tehition Christman, so the only contested issue of any consequence at his trial was whether he intended to rob Tehition when he killed him." Id. at 429. The court found that Myra Christman provided "key testimony on this question" and that, without it, "the only evidence that Eakes or Barnes intended to rob Tehition when they killed him was the fact that Tehition was found in the trunk of his car without his wallet or shoes and his pockets turned inside out." Id. at 428–29. Accordingly, "[b]ecause Myra Christman was the key witness in the case, any evidence arguably impacting her credibility or bias was relevant, material, and should have been disclosed to Eakes' counsel prior to trial." Id. at 429 (citing Harris v. Lafler, 553 F.3d 1028, 1033–34 (6th Cir. 2009)). The court found "[t]he failure of the State to produce the suppressed evidence" to be "inexcusable." Id.

The court also found several errors in this Court's Brady analysis. First, the court found that this Court erred by considering "'the materiality of each individual item of [Brady] evidence separately.'" Id. (quoting Castleberry v. Brigano, 349 F.3d 286, 292 (6th Cir. 2003)). The court found this to contradict the Supreme Court's instruction that "the materiality of withheld evidence may be determined only by evaluating the evidence collectively." Id. (citing Kyles v. Whitley, 514 U.S. 419, 419 (1995)). The court also found that this Court "misread the record (the Victim-Advocate's report was drafted two years before the trial, not after the trial); it failed to address ADA Haycox's May 1999 case notes; and it reached an erroneous legal conclusion" by finding that the prosecutor was not responsible for disclosing the Victim-Advocate's report because it was located in a different part of the District Attorney's office. Id. at 429 (noting that "the prosecutor

11

is in fact responsible for disclosing all <u>Brady</u> information in the possession of that office . . . even if the prosecutor was unaware of the evidence prior to trial").

The court then analyzed the relevance of the undisclosed <u>Brady</u> material. The court found the evidence "favorable to Eakes because it showed that Myra's trial testimony over two years after the murder was significantly different than her recollection of events just three months after the murder." <u>Id.</u> Specifically, the court found that Milam's letter was the only evidence to show "that Myra was willing to change her initial detailed story about how Tehition came about carrying $175 the night of the murder to conform to the documentary evidence," that Myra "earlier gave a different answer about who called Tehition the night he was murdered," and that Myra "added jewelry to the detailed list of items she recounted [Tehition to have been wearing on the night of the murder] more than two years earlier." <u>Id.</u> The court found that the Victim-Advocate Report and Haycox's case notes would have allowed Eakes "to show that Myra's bias and vindictiveness led her to supplement the valuables Tehition supposedly wore to create evidence of Eakes' motive for robbing Tehition" and "to show that Myra and her husband pressed the State to charge Eakes with felony murder so that he would receive the death penalty or a lifetime prison sentence when the prosecutors initially assigned to the case were reluctant to do so." <u>Id.</u> at 429–30. From this analysis, the court concluded that, because this evidence "could have been used to attack Myra's credibility, it may well have been determinative of Eakes' guilt or innocence on the felony-murder charge. The evidence was material because Eakes' felony-murder conviction rested largely on her testimony which was <u>not</u> strongly corroborated." <u>Id.</u> at 430.

Despite reaching this conclusion, the court found it was constrained by AEDPA's "'requirement that an applicant for a writ of habeas corpus first exhaust her claims in state court before presenting them to federal court.'" <u>Id.</u> (quoting <u>Rockwell v. Yukins</u>, 217 F.3d 421, 423 (6th

Cir. 2000)). The court found that Eakes' Brady claim was unexhausted because it had not yet been presented to any state court. Although the court found that Eakes could not file another petition for post-conviction relief under state law and that Tennessee did not recognize Brady claims as grounds to reopen a post-conviction proceeding, it found that a state-law remedy was still available to Eakes through a petition for a writ of coram nobis. Id.

The court found that it had "three options" in this procedural posture: "(1) affirm the denial of the petition if the unexhausted claims are meritless; (2) vacate and remand with instructions to dismiss the petition for lack of exhaustion if there is no 'cause' excusing petitioner's failure to exhaust; or (3) vacate and remand the case to the district court if the petitioner has 'cause' to excuse his failure to exhaust and wishes to pursue exhaustion of his state court remedies." Id. (citing Harris, 553 F.3d at 1031–32). The court found that it could not "affirm the district court's ruling because it misapplied the Brady standard" and vacated that part of its ruling. Id. at 431. The court then remanded the case "with instructions to stay the case so that Eakes can pursue exhaustion of available state court remedies." Id. In so doing, the court found that Eakes had good cause for failing to exhaust his Brady claim because his lawyer had discovered the evidence only after Eakes filed his federal habeas petition and that "Eakes' Brady claim is potentially meritorious." Id. The court remanded the case to this Court "for further proceedings as outlined above." Id.

E.     State Coram Nobis Proceedings

Consistent with the Sixth Circuit's decision, this Court stayed the case on December 12, 2014 (Doc. No. 72). Eakes promptly filed a petition for a writ of error coram nobis in the Davidson County Criminal Court (Doc. No. 87). The court held an evidentiary hearing on Eakes' claim on August 2, 2016, at which the Childs brothers and Myra testified. (Doc. No. 89-1.)

While Eakes' coram nobis petition remained pending, the Tennessee Supreme Court issued an opinion in Nunley v. Tennessee, 552 S.W.3d 800 (Tenn. 2018). In Nunley, the court corrected

13

an "unfortunate" mischaracterization of prior decisions that had prompted the Tennessee Court of Criminal Appeals to hold "that a Brady violation can appropriately be raised as a ground for relief under the coram nobis statutes." Id. at 814–15 (citing the Sixth Circuit's decision in Eakes as an example of a federal court following these decisions).

The court found that "the rule announced in Brady and the writ of error coram nobis share a similar overall purpose; both are intended to ensure a fair and reliable determination of the petitioner's criminal liability for the offense with which he was charged." Id. at 817. "Even so," the court held, "the two are different animals, with independent bases, distinct standards, and differing available remedies." Id. For example, the court explained, to establish a Brady claim, a petitioner "must show that the State improperly suppressed material information, favorable to the defense, that it was required to disclose," while a petitioner seeking coram nobis relief need only show that he "'was without fault in failing to present certain evidence at the proper time,'" because the evidence was not disclosed or for other reasons. Id. (quoting Tenn. Code. Ann. § 40-26-105(b)). A petitioner seeking Brady relief need only show that the undisclosed evidence "would have been of significant assistance to his defense," while a petitioner seeking coram nobis relief "must meet a much higher standard" by presenting evidence that "would be admissible at trial, not just information that would have enabled and furthered the investigation in his case." Id. at 818. Evidence is considered material under Brady if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different[,]" while a coram nobis petitioner "need only show that the newly discovered evidence, had it been admitted at trial, may have resulted in a different judgment." Id. For these reasons, the court concluded that "[t]he writ [of error coram nobis] is not designed to address Brady violations." Id. at 819.

On December 7, 2018, the Davidson County Criminal Court denied Eakes' petition for a writ of error coram nobis. (Doc. 97-1.) Eakes appealed that decision, and the Tennessee Court of Criminal Appeals affirmed the denial of the petition on May 14, 2020. (Doc. No. 111-1.) The Court of Criminal Appeals did not address the trial court's evaluation of the newly discovered evidence under the coram nobis standard. Instead, it found Eakes' petition untimely because it was not filed until seventeen months after Eakes discovered the Brady material. (Id.) Eakes did not seek review by the Tennessee Supreme Court. (Doc. No. 111.)

## II.     Legal Standard

### A.     Brady v. Maryland

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Kyles, 514 U.S. at 432 (quoting Brady, 373 U.S. at 87). The prosecution's disclosure obligation extends to exculpatory evidence as well as impeachment evidence. Giglio v. United States, 405 U.S. 150, 154 (1972) ("When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule." (quoting Napue v. Illinois, 360 U.S. 264, 269 (1959))). To establish a Brady violation, Eakes must demonstrate that  (1) the evidence at issue is favorable to him; (2) the State suppressed that evidence; and (3) the suppression prejudiced Eakes at trial. Brooks v. Tennessee, 626 F.3d 878, 890 (6th Cir. 2010) (quoting Strickler v. Greene, 527 U.S. 263, 281–82 (1999)).

With respect to the third element, which is the only one at issue in Eakes' petition, Eakes must demonstrate prejudice by showing that the suppressed evidence is "material." Brooks, 626 F.3d at 892 (citing Kyles, 514 U.S. at 433–34). In analyzing materiality, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the

15

evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Id. (alteration in original) (quoting Kyles, 514 U.S. at 434). Eakes can show that he was deprived of a fair trial by establishing that there is "'reasonable probability'" that the outcome would have been different if the suppressed evidence had been disclosed. Clark v. Warden, 934 F.3d 483, 492 (6th Cir. 2019) (quoting Banks v. Dretke, 540 U.S. 668, 699 (2004)).

The materiality of the suppressed evidence must be analyzed "collectively, not item by item." Brooks, 626 F.3d at 892 (quoting Kyles, 514 U.S. at 436). It must also be analyzed in the context of the other evidence produced by the state. United States v. Sipe, 388 F.3d 471, 478 (5th Cir. 2004) (quoting Smith v. Black, 904 F.2d 950, 967 (5th Cir. 1990), vacated on other grounds, 503 U.S. 930 (1992)). Suppressed evidence is not material if it is cumulative of evidence that was produced or introduced at trial. Brooks, 626 F.3d at 893 (quoting Carter v. Mitchell, 443 F.3d 517, 533 n.7 (6th Cir. 2006)). Similarly, suppressed evidence is not material if its only use would have been to impeach the testimony of a witness whose account was strongly corroborated by other evidence. Sipe, 388 F.3d at 478 (citing Wilson v. Whitley, 28 F.3d 433, 439 (5th Cir. 1994)). However, when the suppressed impeachment evidence "would seriously undermine the testimony of a key witness on an essential issue or there is no strong corroboration, the withheld evidence has been found to be material." Id. (quoting United States v. Weintraub, 871 F.2d 1257, 1262 (5th Cir. 1989)).

### B. Antiterrorism and Effective Death Penalty Act (AEDPA)

Under AEDPA, when a state court has ruled on a petitioner's constitutional claim, a federal court cannot grant the petitioner habeas relief unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law" or "was based on an unreasonable determination of the facts in light of the evidence presented . . . ." 28 U.S.C. § 2254(d)(1)–(2). AEDPA "dictates a highly deferential standard for evaluating state-court

rulings," and "demands that state-court decisions be given the benefit of the doubt." Bell v. Cone, 543 U.S. 447, 455 (2005) (citations omitted); see also Hardy v. Cross, 565 U.S. 65, 66 (2011); Felkner v. Jackson, 562 U.S. 594, 598 (2011). The AEDPA standard is difficult to meet "because it was meant to be." Harrington v. Richter, 562 U.S. 86, 102 (2011); see also Burt v. Titlow, 571 U.S. 12, 20 (2013); Metrish v. Lancaster, 569 U.S. 351, 357–58 (2013); Cullen v. Pinholster, 563 U.S. 170, 181 (2011). The statute enforces the principle that "habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Harrington, 562 U.S. at 102–03 (quoting Jackson v. Virginia, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring)); see also Woods v. Donald, 575 U.S. 312, 316 (2015).

However, "AEDPA's deferential standard of review applies only to state-court adjudications on the merits" of a constitutional claim. Jalowiec v. Bradshaw, 657 F.3d 293, 301 (6th Cir. 2011); see also Bell v. Bell, 512 F.3d 223, 231 (6th Cir. 2008) ("AEDPA's applicability is relevant only to the extent that we must review a state court's ruling on Bell's claims."). To ensure that petitioners seek to obtain a merits-ruling in state court before pursuing relief in federal court, AEDPA directs that "[a]n application for a writ of habeas corpus . . . shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State[,]" 28 U.S.C. § 2254(b)(1)(A), or such remedies are not available, id. § 2254(b)(1)(B)(i). When a state court declines to rule on the merits of a petitioner's claims, "there is an absence of available state corrective process[,]" and AEDPA excuses the petitioner's failure to exhaust those claims. Deitz v. Money, 391 F.3d 804, 812 (6th Cir. 2004), abrogated on other grounds by Stone v. More, 644 F.3d 342 (6th Cir. 2011). Therefore, if a state-court ruling on the merits of a

petitioner's constitutional claim is unavailable, AEDPA does not prevent a federal court from conducting a de novo review of that claim. Bell, 512 F.3d at 231.

If a state-court decision on the merits of a petitioner's claim is lacking because the petitioner failed to abide by the state's procedural rules governing presentation of that claim, the claim may be procedurally defaulted and will not be heard in federal court. See Lovins v. Parker, 712 F.3d 283, 294 (6th Cir. 2013) (explaining that "[t]he procedural default rule is related to the statutory requirement that a habeas petitioner must exhaust any available state-court remedies before bringing a federal petition" and is designed to ensure that state courts have the first opportunity to address federal constitutional claims); see also Buell v. Mitchell, 274 F.3d 337, 349 (6th Cir. 2001) (holding that "a petitioner cannot circumvent the exhaustion requirement by failing to comply with state procedural rules" (quoting Coleman v. Mitchell, 244 F.3d 533, 538 (6th Cir. 2001))). A federal court will excuse a petitioner's procedural default if the petitioner "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law[.]" Bell, 512 F.3d at 231 n.3 (quoting Coleman v. Thompson, 501 U.S. 722, 750 (1991)). The Supreme Court has held that "the cause and prejudice standard tracks the last two elements of a Brady claim: suppression by the government and materiality." Id. (citing Banks, 540 U.S. at 691). Accordingly, "showing an actual Brady violation is itself sufficient to show cause and prejudice." Jones v. Bagley, 696 F.3d 475, 486–87 (6th Cir. 2012); Brooks, 626 F.3d at 890–91 (same); Bell, 512 F.3d at 231 n.3 (same).

III.     Analysis

As a preliminary matter, neither AEDPA's exhaustion requirement nor procedural default is an obstacle to granting Eakes relief. As the State concedes, in the wake of the Tennessee Supreme Court's decision in Nunley, there is no way for Eakes to exhaust his Brady claim in state court. The State also has waived any argument that Eakes procedurally defaulted his Brady claim

by failing to raise it in his initial petition for state post-conviction relief. See Lovins, 712 F.3d at 295. Regardless, the potentially meritorious nature of Eakes' Brady claim excuses any procedural default.

Considering Eakes' petition and the history of this case in full, the Court finds that he is entitled to relief for two reasons. First, the Sixth Circuit's conclusion that the suppressed evidence was material is the law of the case that this Court is bound to follow and no exception to that doctrine applies here. Second, if this Court were to undertake a new analysis of the undisclosed evidence's materiality, it would reach the same conclusion: Eakes was denied a fair trial on his felony-murder charge because the prosecution withheld evidence that would have enabled him to impeach the largely uncorroborated testimony of the prosecution's key witness, Myra Christman.

### A. The Law of the Case Doctrine

"The doctrine known as 'law of the case' encapsulates a simple idea: courts generally decline to redecide issues that they have already decided." Samons v. Nat'l Mines Corp., 25 F. 4th 455, No. 20-3209, 2022 WL 420539, at *5 (6th Cir. Feb. 11, 2022) (citing Messenger v. Anderson, 225 U.S. 436, 444 (1912)). "Under the doctrine of the law of the case, determinations of the court of appeals of issues of law are binding on both the district court on remand and the court of appeals upon subsequent appeal." United States v. Campbell, 168 F.3d 263, 265 (6th Cir. 1999); see also Moody v. Michigan Gaming Control Bd., 871 F.3d 420, 425 (6th Cir. 2017) (holding that the law of the case doctrine is primarily "intended to enforce a district court's adherence to an appellate court's judgment"). "'The doctrine precludes a court from reconsideration of issues decided at an early stage of litigation, either explicitly or by necessary inference from the disposition.'" Vander Boegh v. EnergySolutions, Inc., 772 F.3d 1056, 1071 (6th Cir. 2014) (quoting Westside Mothers v. Olszewski, 454 F.3d 532, 538 (6th Cir. 2006)). The related mandate rule "'is a specific application of the law-of-the-case doctrine'" and provides "'that a district court is bound to the

scope of the remand issued by the court of appeals.'"[3] <u>Scott v. Churchill</u>, 377 F.3d 565, 570 (6th Cir. 2004) (quoting <u>Campbell</u>, 168 F.3d at 265\; <u>Waste Mgmt. of Ohio, Inc. v. City of Dayton</u>, 169 F. App'x 976, 986 (6th Cir. 2006) ("When a superior court determines the law of the case and issues its mandate, a lower court is not free to depart from it."). "Accordingly, '[u]pon remand of a case for further proceedings after a decision by the appellate court, the trial court must "proceed in accordance with the mandate and the law of the case as established on appeal.'" <u>United States v. Moored</u>, 38 F.3d 1419, 1421 (6th Cir. 1994) (quoting <u>United States v. Kikumura</u>, 947 F.2d 72, 76 (3d Cir. 1991)). "The mandate 'must be read with the analysis offered in the opinion . . . [and] context matters.'" <u>Kindle v. City of Jeffersontown, Ky.</u>, 589 F. App'x 747, 753 (6th Cir. 2014) (quoting <u>United States v. O'Dell</u>, 320 F.3d 674, 681 (6th Cir. 2003)).

Application of the law of the case doctrine is "'limited to those questions necessarily decided in the earlier appeal.'" <u>Vander Boegh</u>, 772 F.3d at 1071 (quoting <u>Hanover Ins. Co. v. Am. Eng'g Co.</u>, 105 F.3d 306, 312 (6th Cir. 1997)). "[T]he phrase 'necessarily decided . . . describes all issues that were 'fully briefed and squarely decided' in an earlier appeal." <u>Perkins v. Am. Elec. Power Fuel Supply, Inc.</u>, 91 F. App'x 370, 374 (6th Cir. 2004) (quoting 1B James Wm. Moore, Moore's Federal Practice ¶ 0.404(1), at 11–5 (2d ed. 1996)). Those issues may be decided "either <u>explicitly</u> or by <u>implication</u>." <u>Waste Mgmt. of Ohio</u>, 169 F. App'x at 986. An issue is implicitly resolved by a court of appeals when, for example, "'(1) resolution of the issue was a necessary step in resolving the earlier appeal; (2) resolution of the issue would abrogate the prior decision

---

[3]      In a concurring opinion issued in <u>Medical Center at Elizabeth Place, LLC v. Atrium Health System</u>, 922 F.3d 713 (2019), Judge Sutton helpfully described the relationship between the law of the case doctrine and mandate rule. Judge Sutton found that law of the case "has two parts." <u>Id.</u> at 734. The first—the mandate rule—"is vertical" and establishes that a lower court is "duty bound to follow the mandate of [a] superior court." <u>Id.</u> The second part "is horizontal" and "'expresses the practice of courts generally to refuse to reopen what has been decided' by an earlier panel of the same court in the same case." <u>Id.</u> (quoting <u>Messenger</u>, 225 U.S. at 444).

and so must have been considered in the prior appeal; and (3) the issue is so closely related to the earlier appeal its resolution involves no additional consideration and so might have been resolved but unstated.'" Id. (quoting McIlravy v. Kerr-McGee Coal Corp., 204 F.3d 1031, 1036 (10th Cir. 2000)). When an issue has been necessarily decided by the court of appeals, a lower court may reconsider it only "'in very special situations.'" Moored, 38 F.3d at 1421 (quoting United States v. Bell, 988 F.2d 247, 251 (1st Cir. 1993)).

The first question is thus whether the Sixth Circuit "necessarily decided" that the Brady evidence discovered by Eakes is material. Vander Boegh, 772 F.3d at 1071. Eakes point the Court to the standard articulated in Perkins that an issue is "necessarily decided" and therefore law of the case if it was "'fully briefed and squarely decided' in an earlier appeal." 91 F. App'x at 374; see also Vander Boegh, 772 F.3d at 1071 (adopting Perkins' definition). Eakes argues that the Sixth Circuit necessarily decided the question of materiality because it was the only issue that the parties argued on appeal—and thus "fully briefed"—and was "squarely decided" by the Sixth Circuit's conclusion that "[t]he evidence was material[.]" (Doc. No. 95, PageID# 2599–2600) (quoting Eakes I, 592 F. App'x at 430).[4] (Doc. No. 95.) The State argues that the only issues that the Sixth Circuit necessarily decided before remanding the case are that Eakes' claims were unexhausted and that this Court's denial of Eakes' petition was in error. (Doc. No. 90.) It maintains that "[t]he Sixth Circuit's language on the subject of materiality went beyond what was necessary to reach the ultimate conclusion that the claim was unexhausted and required a remand. As such, those comments are dicta[,]" and do not constitute the law of the case. (Id.)

---

[4]      The parties' briefs to the Sixth Circuit show that Eakes argued the materiality of the Brady evidence and that three of this Court's factual findings were clearly erroneous (Doc. No. 93-1) and that the State argued only that this Court properly denied relief "because [Eakes'] claim under Brady v. Maryland rests on documents that are not materially exculpatory as impeachment evidence" (Doc. No. 93-2).

The State is correct that the Sixth Circuit could have remanded Eakes' case by finding, first, that this Court made errors in its application of the Brady standard, and second, that Eakes' claims were unexhausted. But the Sixth Circuit did not so limit its opinion. Instead, the court engaged in a detailed consideration of materiality in the context of a Brady claim, then applied that definition to the Brady evidence at issue in Eakes' appeal. Eakes I, 592 F. App'x at 427–28.

The court first found that "the only contested issue of any consequence at [Eakes'] trial was whether he intended to rob Tehition when he killed him." Id. at 428. The court found that Myra provided "[k]ey testimony on this question[,]" without which "the only evidence that Eakes or Barnes intended to rob Tehition when they killed him was the fact that Tehition was found in the trunk of his car without his wallet or shoes and his pockets turned inside out." Id. This made Myra "the key witness in the case," and "any evidence arguably impacting her credibility or bias was relevant, material, and should have been disclosed to Eakes' counsel prior to trial." Id. at 429. The court then found that "[t]he undisclosed evidence was favorable to Eakes because it showed that Myra's trial testimony over two years after the murder was significantly different than her recollection of events just three months after the murder." Id.

Taking each piece of the undisclosed evidence in turn, the court found that, without ADA Milam's letter, Eakes' counsel could not have known "that Myra was willing to change her initial detailed story about how Tehition came about carrying $175 the night of the murder to conform to the documentary evidence"; "that Myra earlier gave a different answer about who called Tehition the night he was murdered," leaving counsel "unable to question her about where Tehition said he was going when he left the house"; or "that Myra added jewelry to the detailed list of items she recounted more than two years earlier." Id. The court further found that, if Eakes' counsel had been provided the Victim-Advocate Report and ADA Haycox's case notes, he could have used

them to show "that Myra's bias and vindictiveness led her to supplement the valuables Tehition supposedly wore to create evidence of Eakes' motive for robbing Tehition" and "that Myra and her husband pressed the State to charge Eakes with felony murder so that he would receive the death penalty or a lifetime prison sentence when the prosecutors initially assigned to the case were reluctant to do so." Id. at 429–30. Considering the potential effect of the undisclosed evidence collectively in attacking Myra's credibility, the court found that "it may well have been determinative of Eakes' guilt or innocence on the felony-murder charge." Id. at 430. The court concluded:

> The evidence was material because Eakes' felony-murder conviction rested largely on her testimony which was <u>not</u> strongly corroborated. Id. If disclosed and used effectively, this evidence may have made the difference between Eakes' conviction or acquittal on this charge. But the court reviewing a <u>Brady</u> claim need not determine whether Eakes can show it was more likely than not that he would have received a different verdict had he possessed that evidence. The question is whether, in its absence, he received a fair trial. <u>Brooks</u>, 626 F.3d at 892 (citing <u>Kyles</u>, 514 U.S. at 434.

> <u>Id.</u>

Taken in this context, is the Sixth Circuit's pronouncement that the <u>Brady</u> evidence "was material" merely dicta that falls outside the scope of the law of the case? The State argues that "[t]he Sixth Circuit's language on the subject of materiality went beyond what was necessary to reach the ultimate conclusion that the claim was unexhausted and required a remand. As such, those comments are dicta." (Doc. No. 90, PageID# 2455.)  But the law of the case encompasses "'[i]ssues decided . . . either explicitly or by necessary inference from the disposition,'" <u>Coal Resources, Inc. v. Gulf & Western Industries, Inc.</u>, 865 F.2d 761, 766 (6th Cir. 1989), including issues that the court was not required to decide to reach its holding. <u>Perkins</u>, 91 F. App'x at 374. "[N]early all of [the Sixth Circuit's] cases applying the mandate rule state that the rule covers issues 'expressly or impliedly'—not 'necessarily'—decided in a prior appeal." <u>Id.</u> (first citing

O'Dell, 320 F.3d at 679; then citing Moored, 38 F.3d at 1421; and then citing Jones v. Lewis, 957 F.2d 260, 262 (6th Cir. 1992)). The fact that the court did not need to determine materiality to dispose of Eakes' appeal does not automatically exclude that finding from the law of the case.

In Wright v. Spaulding, the Sixth Circuit explored the distinction between holdings and dicta and noted several factors that mark "a court's conclusion about an issue to be part of its holding[.]" 939 F.3d 695, 701 (6th Cir. 2019). First, the decision "must contribute to the judgment . . . A legal conclusion that is necessary to the judgment qualifies. So might one sufficient to support the judgment but not strictly necessary in light of an independent and equally sufficient conclusion . . . ." Id. Second, "the court must have actively applied the conclusion to the case in front of it . . . This rule helps distinguish a case of true independent holdings . . . from one in which a court decides one issue and merely opines about another . . . ." Id. "Finally, it must be clear that the court considered the issue and consciously reached a conclusion about it." Id. at 702.

The Sixth Circuit's conclusion that the Brady evidence "was material" to Eakes' case hits all three of these marks. The court engaged in a thorough consideration of the materiality standard and actively applied it to the Brady evidence presented in Eakes' appeal, concluding that the evidence was material. It also determined that Eakes had a remaining available state remedy of a writ of error coram nobis that AEDPA's exhaustion requirement obligated him to pursue. The court marked that determination as an independent conclusion, separate from its determination that the Brady evidence was material, with a clear semantic transition: "The evidence was material because Eakes' felony-murder conviction rested largely on [Christman's] testimony which was not strongly corroborated . . . That said, before seeking federal habeas relief, state prisoners must first exhaust their available state court remedies by fairly presenting all their claims to the state courts." Eakes I, 592 F. App'x at 430. The evidence is material, and Eakes has one more step to

24

take before this Court can grant relief—two independent conclusions ultimately requiring a remand.

The State rests its assertion that "the court did not actually decide the merits of the Brady claims" on the premise that, "[h]ad it done so, no remand would have been necessary, and [Eakes] would have been granted the relief that he currently seeks." (Doc. No. 90, PageID# 2454.) But the Sixth Circuit found that granting Eakes' petition was not an available path under AEDPA. Instead, the court found that, because it considered Eakes' claim unexhausted, it had only "three options: (1) affirm the denial of the petition if the unexhausted claims are meritless; (2) vacate and remand with instructions to dismiss the petition for lack of exhaustion if there is no 'cause' excusing petitioner's failure to exhaust; or (3) vacate and remand the case to the district court if the petitioner has 'cause' to excuse his failure to exhaust and wishes to pursue exhaustion of his state court remedies." Eakes I. 592 F. App'x at 431 (citing Harris, 553 F.3d at 1031–32). The Court found that "Eakes has 'good cause' for failing to exhaust his Brady claim in state court because his lawyer discovered the documentary evidence only after Eakes had filed his federal habeas petition. Furthermore, as discussed above, Eakes' Brady claim is potentially meritorious."[5] Id. Having so found, the court remanded the case "with instructions to stay the case so that Eakes can pursue exhaustion of available state court remedies." Id.

_____

[5]     The court's statement that Eakes' Brady claim was "potentially meritorious" in the context of its exhaustion and remand analysis does not negate its earlier finding in the context of its Brady analysis that the subject evidence "was material." It appears that this statement refers back to the court's quoting of Rhines v. Weber, 544 U.S. 269, 274 (2005), to establish that "the 'stay and abeyance' option" is an appropriate remand instruction "only . . . where the petitioner had 'good cause for his failure to exhaust, his unexhausted claims are potentially meritorious, and there is no indication that the petitioner engaged in intentionally dilatory litigation tactics.'" Eakes I, 592 F. App'x at 430 (quoting Rhines, 544 U.S. at 278).

Then the court added an important coda: "Given the tremendous lapse of time in procuring the undisclosed evidence—and the effort it took to do so—it may seem unfair to direct Eakes back to the state courts to resolve his <u>Brady</u> claim. But we are constrained by statute to do so." <u>Id.</u> In applying the law of the case doctrine, "[t]he trial court must implement both the letter and the spirit of the mandate, taking into account the appellate court's opinion and the circumstances it embraces." <u>Mason v. Mitchell</u>, 729 F.3d 545, 550 (6th Cir. 2013). "[C]ontext matters," <u>O'Dell</u>, 320 F.3d at 681, and the context and circumstance point in the same direction here: that the Sixth Circuit "squarely decided" that Eakes' <u>Brady</u> evidence was material to his defense. <u>Perkins</u>, 91 F. App'x at 374. That holding stands as the law of the case.

The State asserts that, even if the Court finds the Sixth Circuit's determination that the <u>Brady</u> evidence was material to be the law of the case, exceptions to that doctrine apply. (Doc. No. 90, PageID# 2455–58.) "[A] court's power to reach a result inconsistent with a prior decision reached in the same case is 'to be exercised very sparingly, and only under extraordinary conditions.'" <u>In re Kenneth Allen Knight Tr.</u>, 303 F.3d 671, 677 (6th Cir. 2002) (quoting <u>Gen. Am. Life Ins. Co. v. Anderson</u>, 156 F.2d 615, 619 (6th Cir. 1946)). The Sixth Circuit has identified three exceptions to the law of the case doctrine: "'(1) where substantially different evidence is raised on subsequent trial; (2) where a subsequent contrary view of the law is decided by the controlling authority; or (3) where a decision is clearly erroneous and would work a manifest injustice.'" <u>Vander Boegh</u>, 772 F.3d at 1071 (quoting <u>Hanover</u>, 105 F.3d at 312). The State argues that "new evidence was presented at the error coram nobis evidentiary hearing in state court that undermines the Sixth Circuit's analysis" and "the Sixth Circuit's materiality analysis on the record before it was clearly erroneous because it failed to consider whether the alleged impeachment

evidence would have been admissible at trial under state law." (Doc. No. 90, PageID# 2455–56.) Neither argument has merit.

The first exception argued by the State applies "only if the record actually contains new evidence . . . [that] 'differs materially from the evidence of record when the issue was first decided . . . .'" Pipefitters Local 636 Ins. Fund v. Blue Cross & Blue Shield of Mich., 418 F. App'x 430, 435 n.4 (6th Cir. 2011) (quoting Hamilton v. Leavy, 322 F.3d 776, 788 (3d Cir. 2003)). Evidence is not "new" for the purpose of this exception if it was available at the time of the prior decision. See Yankton Sioux Tribe v. Podhradsky, 606 F.3d 994, 1005 (8th Cir. 2010) (concluding that defendants' evidence was not "truly 'new'" where it could "have reasonably been developed and presented in earlier stages of this litigation"); Baumer v. United States, 685 F.2d 1318, 1321 (11th Cir. 1982) (holding that evidence produced at an evidentiary hearing was not "new" where there was "nothing in the record to indicate that the evidence . . . was unavailable to the taxpayers during the first trial"); In re M.T.G., Inc., 291 B.R. 694, 702 n.13 (E.D. Mich. 2003) (explaining that deviation from mandate rule to consider new evidence is only appropriate where that evidence "was not earlier obtainable through due diligence . . ."). Construing the exception narrowly "discourage[s] slovenly or ill-considered approaches to the first trial." 18B Charles Alan Wright et al., Federal Practice and Procedure § 4478 (2d ed. updated Aug. 2019).

The State has not shown that the evidence presented at the coram nobis hearing is new for purposes of this exception or that the evidence differs materially from that considered by the Sixth Circuit in Eakes I. As Eakes argues, the "new" evidence that the Warden asks this Court to consider—namely, Myra's testimony and the purported revelation, through cross-examination, that the Childs brothers have criminal histories—could have been obtained at the federal evidentiary hearing on the materiality of the suppressed evidence. Myra did not testify at the

federal evidentiary hearing because the State did not call her as a witness. Eakes' counsel recalls "that [Myra] attended [that] hearing[.]" (Doc. No. 95, PageID# 2601.) Further, the State has not offered any reason why it could not have cross-examined the Childs brothers regarding their criminal histories at the federal evidentiary hearing, where both testified at length. Finally, none of the new evidence that the State cites differs materially from the evidence considered by the Sixth Circuit before remand. The testimony that the State points to is duplicative of the testimony presented in the federal evidentiary hearing, supports the Sixth Circuit's analysis, or is insufficient to undermine the Sixth Circuit's conclusions.

The State has also failed to show that the Sixth Circuit's materiality analysis was clearly erroneous and that adherence to it would constitute a manifest injustice. This exception "is more likely to be described than employed" and typically demands "both a showing of clear error and a finding that failure to correct the error would cause manifest injustice." 18B Federal Practice and Procedure § 4478. The State argues that the Sixth Circuit's materiality analysis was clearly erroneous because it did not consider whether the alleged impeachment evidence would have been admissible at trial under state law. But, as the State acknowledges, inadmissible impeachment evidence can be material so long as it leads to admissible evidence. See Barton v. Warden, S. Ohio Corr. Facility, 786 F.3d 450, 465 (6th Cir. 2015) (explaining "that Brady is not a hard and fast evidentiary rule" and that "inadmissible [evidence] might nonetheless be considered 'material under Brady if it would lead directly to admissible evidence'" (quoting Wogenstahl v. Mitchell, 668 F.3d 307, 325 n.3 (6th Cir. 2012)). In the absence of any argument from the State that the Brady material at issue would have been inadmissible at Eakes' trial and would not have led to

admissible evidence, the Court cannot find that the Sixth Circuit's holding was clearly erroneous.[6]

That is especially so given that the State did not argue the question of admissibility to the Sixth

Circuit, even after Eakes pointed to persuasive authority supporting the admissibility of the <u>Brady</u>

material. <u>Compare</u> (Doc. No. 93-2), <u>with</u> (Doc. No. 93-1, PageID# 2506 (citing <u>Smith v. United</u>

<u>States</u>, 283 F.2d 16, 20 (6th Cir. 1960) and Tenn. R. Evid. 616)); <u>see also</u> <u>O'Dell</u>, 320 F.3d at 681–

82 (finding that no manifest injustice warranting departure from mandate rule would result from

trial court's failure to hear sentencing argument that plaintiff had waived by failing to raise it at

the appellate level). The Sixth Circuit implicitly found the impeachment evidence admissible when

it explained that "[t]he right to expose bias is so fundamental that generally applicable evidentiary

rules that otherwise limit inquiry into specific instances of conduct do not apply to credibility

attacks based on motive or bias." <u>Eakes I</u>, 592 F. App'x at 428. The State offers no basis to find

error in that conclusion.

**B.      This Court's Materiality Analysis in Light of the Coram Nobis Proceedings
         Leads to the Same Result**

Even if the Sixth Circuit's materiality finding were not the law of the case, renewed

consideration of the same evidence in light of the parties' arguments on remand leads to the same

---

[6]      The State points out that, "during the error coram nobis proceeding in state court, several pieces of the alleged impeachment evidence were excluded by the trial court on grounds such as opinion work product, relevance, or hearsay." (Doc. No. 90, PageID# 2458.) The <u>coram nobis</u> proceeding is not a model of evidentiary jurisprudence: in its rulings regarding admissibility, the <u>coram nobis</u> court barely cited any law (Doc. Nos. 80-5, 97-1), and during the evidentiary hearing, the court jokingly wondered aloud whether it knew the rules of evidence, and admitted that it had "no recollection" of what it had already ruled with respect to admissibility (Doc. No. 89-1, PageID# 2399). Regardless,  the <u>coram nobis</u> court's admissibility rulings do not control the materiality component of Eakes' <u>Brady</u> claim: as the Tennessee Supreme Court recently explained in <u>Nunley</u>, and as discussed above, "successful <u>Brady</u> claims [may] stand upon inadmissible evidence that would not entitle a defendant to coram nobis relief." <u>Nunley</u>, 552 S.W.3d at 818 (alteration in original).

29

result. This is largely because, as Eakes points out, the State's arguments on remand are nearly identical to its arguments on appeal.[7] (Doc. No. 95, PageID# 2596.)

The State does not dispute that Myra was a key witness to its felony murder case.[8] Instead, the State's argument focuses on attacking the impeachment value of the suppressed evidence, claiming that, when it is viewed as a whole and in light of the evidence presented at the coram nobis hearing, the most Eakes could have accomplished with it would have been to reveal "slight, technical inconsistencies" in Myra's testimony. (Doc. No. 90, PageID# 2460.) This Court does not agree. Considering the evidence collectively, as it must, Eakes I, 592 F. App'x at 429, the Court finds it sufficiently probative of Myra's credibility that Eakes could not have received a fair trial without it.

### 1.    Myra's Bias

The State argues that Myra's desire for Eakes to receive the greatest possible punishment "is common among similarly situated individuals" and is therefore "hardly unusual," and that the same is true of Myra's refusal to believe that Tehition was involved with drugs because "common experience shows that parents often choose to believe that their children are good and law-abiding citizens, not criminals, even in the face of proof to the contrary." (Doc. No. 90, PageID# 2461.)

---

[7]    This bolsters the Court's conclusion that the evidence developed in the coram nobis proceedings does not materially alter the landscape of the case.

[8]    The only hint that the State disagrees with the Sixth Circuit on this front comes from his statement that Christman's testimony regarding Tehition's valuables was "corroborated by other evidence[,]" including the "remnants of a chain necklace" in the motel room and the fact that Tehition was found without shoes. (Doc. No. 90, PageID# 2466.) The Court agrees with the Sixth Circuit that any corroboration that such circumstantial evidence provides is not strong. The detective who found the jewelry remnants testified that they were made of "chain of some type" and could have been part of a bracelet or necklace (Doc. No. 47-5, PageID# 818). Further, it makes little sense that Eakes and Barnes would leave remnants of jewelry behind after killing Tehition if their intent was to rob him of that jewelry.

The Court does not discount the grief that Myra undoubtedly experienced as she mourned the death of her son. The way Myra may have expressed that grief, however, is material to Eakes' defense against the felony murder charge. The Victim Advocate's Report, drafted ten days after Tehition was murdered, described Myra and Ward as a "handful," explaining that they refused to believe that Tehition was involved with drugs and insisted that Eakes and Barnes be sentenced to the death penalty or life without parole. (Doc. No. 34-2, PageID# 242.) Haycox echoed the advocate's sentiment nearly two years later, noting that Myra continued to deny that Tehition used drugs despite an autopsy report showing drug use and had "larger ideas about the case than the facts support[ed]." (Doc. No. 34-5, PageID# 250.) The Tennessee Rules of Evidence recognize that "[b]ias is an important ground for impeachment[,]" Tenn. R. Evid. 616 advisory commission comment (citing <u>Creeping Bear v. State</u>, 87 S.W. 653 (1905)), and Eakes could have used these documents to cross-examine Myra regarding her advocating for a felony-murder charge against Eakes, despite the evidence. <u>See</u> <u>Creeping Bear</u>, 87 S.W. at 653 (finding that "[i]t is always competent to prove . . . a witness['s] . . . partiality for one party or hostility to the other" and, therefore, "proof of the relations of the witness to the parties may be shown by proving [the witness's] conduct and expressions in relation to them by cross-examination"); Tenn. R. Evid. 616 (providing that "[a] party may offer evidence by cross-examination, extrinsic evidence, or both, that a witness is biased in favor of or prejudiced against a party or another witness").

### 2. Myra's Inconsistent Statements

The suppressed evidence reveals more than minor inconsistencies in Myra's accounts of the events surrounding Tehition's murder. When the Milam Letter, Haycox's Notes, and the Naylor Investigative Report Form are read together, they show that the Childs brothers flatly contradicted Myra's claim that Barnes had said things to the brothers after the murder that suggested he and Eakes had robbed Tehition. At both the federal evidentiary hearing and the coram

nobis hearing, the Childs brothers provided testimony that was consistent with the statements reflected in the suppressed documents.[9] (Doc. Nos. 54, 89-1.) Armed with the conflict between the Childs brothers' statements and Myra's statements, Eakes' counsel could have cross-examined Myra regarding her interview with Milam and sought to impeach her by calling the brothers to testify. See Creeping Bear, 87 S.W. at 653 (explaining that witnesses may be called for the purpose of showing the bias of another witness). The State questions the value of any impeachment testimony from the Childs brothers by claiming that they are "inherently unreliable witnesses given their drug dealing and criminal histories[,]" which were revealed through cross-examination at the coram nobis hearing. (Doc. No. 90, PageID# 2463.) But "[i]t is not for the State to weigh the evidence and decide what the jury would ultimately find to be material and exculpatory—that is something that the jury itself must decide." Barton, 786 F.3d at 466. Regardless, the State's attack on the value of the Childs brothers' testimony is belied by the State's unpersuasive claim that Kevin Child's testimony at the coram nobis proceeding reinforced the prosecution's robbery theory and corroborated Myra's testimony. The State asks the Court to find Kevin Childs's testimony unreliable on the basis of his drug history when it supports Eakes, but credible when it aids the prosecution.

The Milam Letter also shows that Myra changed her story regarding the valuables that Eakes was carrying on the night that he was killed. Myra told Milam that, on the day of Tehition's murder, she deposited $299.00 of Tehition's $474.00 tax return in a credit union account and gave the remaining $175.00 to Tehition. At trial, Myra testified that she had actually withdrawn $300.00

---

[9]     At the coram nobis hearing, Kevin Childs claimed that he no longer remembered the conversation he had with Barnes the night that Tehition was killed. (Doc. No. 89-1.) Nonetheless, Childs did not disavow his prior testimony in federal court that Barnes never told him that Barnes had robbed someone that night. (Doc. No. 89-1.)

from the account and given Tehition $175.00, shifting her testimony to conform to the records. Myra's testimony also significantly expanded the list of valuables that Tehition had on his person, adding a gold necklace, a diamond earring, and an expensive pair of sneakers to the description she provided Milam. Myra's evolving testimony regarding Tehition's valuables could have provided additional impeachment evidence, especially in the context of the other evidence showing that her bias may have caused her to amend her statements in support of the felony-murder charges. Myra's testimony at the coram nobis hearing confirmed this proclivity. As Eakes emphasizes, Myra's testimony further undermined her credibility: rather than stick to her prior description of the valuables that Tehition was wearing the night he was killed, Myra claimed that Tehition was actually wearing a ring on each finger and alleged, despite the conflicting autopsy report, that Eakes had sliced off Tehition's ear. (Doc. No. 47-8; Doc. No. 89-1.)

Finally, strongly underscoring the importance of evidence that could be used to impeach Myra testimony is that, when Myra did not testify in Barnes's trial, the jury hung on the felony murder charge twice. Eakes I, 592 F. App'x at 423. "[T]he fact that the jury was unable to reach a verdict" without Myra's testimony in Barnes's trial "provides strong reason to believe the significant errors [of suppressed evidence] that occurred at [Eakes'] trial were prejudicial." Kyles, 514 U.S. at 455. It also indicates that, as to the felony murder charge, this was "essentially [a] one-witness case" for the prosecution; in that context, failure to disclose evidence speaking to that witness's credibility "seriously undermines confidence in the outcome of the trial." Boyette v. Lefevre, 246 F.3d 76, 93 (2d Cir. 2001).

In sum, the State has not offered any new argument or evidence that justifies a departure from the Sixth Circuit's thorough materiality analysis. By suppressing evidence that could have been used to portray the State's key witness as biased and dishonest, the prosecution undermined

confidence in the fairness of the jury's verdict. Due process requires that Eakes have the opportunity to defend himself with the aid of the suppressed evidence in a new trial on the felony-murder charge.

IV. **Conclusion**

The Sixth Circuit's conclusion that the suppressed evidence is material constitutes the law of the case and binds this Court. Even if it did not, the Court would reach the same conclusion. The prosecution suppressed evidence that was essential to Eakes' defense against a charge of felony-murder and the resulting life sentence. Through no fault of his own, Eakes discovered that he had a <u>Brady</u> claim after it was too late for it to be considered by a Tennessee court. This is the type of circumstance that the writ of habeas corpus exists to address, and the Court will grant Eakes' petition.

Eakes' motion to reopen this case and issue a conditional writ of habeas corpus (Doc. No. 87) will be GRANTED and the judgment of conviction on the felony-murder charge will be REVERSED. The State will be ORDERED to release Eakes if he is not retried for felony murder within 180 days of the date of final judgment in this proceeding.

The Court finds the public documents Eakes seeks to introduce in his motion to expand the record (Doc. No. 114) unnecessary to its determination of his motion. The motion is therefore DENIED.

An appropriate order is filed herewith.

_____
WAVERLY D. CRENSHAW, JR.
Chief United States District Judge